UNITED STATES of America, Plaintiff,

v.

AMERICAN SOCIETY OF COMPOSERS, AUTHORS AND PUBLISHERS, Defendants.

In The Matter of the Application of TURNER BROADCASTING SYSTEM, INC., Applicant,

For The Determination of Reasonable License Fees.

In the Matter of the Applications of USA NETWORK, Lifetime Television, the Discovery Channel, the CBN Family Channel, Black Entertainment Television, Inc., Arts & Entertainment Cable Network, the Disney Channel, Home Box Office, Inc., Showtime Networks Inc., MTV Networks, Inc., Opryland USA, Inc., Playboy Video Entertainment Group, Inc., American Movie Classics Company, Sportschannel Prism Associates, Bravo Company and Country Music Television, Inc., Applicants,

For Licenses for their Cable Program Services.

Civ. No. 13–95 (WCC).

United States District Court, S.D. New York.

July 11, 1991.

Corrected Aug. 6, 1991.

Memorandum of Court's Rationale for Final Order and Judgment Aug. 8, 1991.

Order and Judgment Aug. 8, 1991.

Bruce D. Sokler, Mintz, Levin, Cohn, Ferris, Glovky and Popeo, P.C., Washington, D.C., David Dunn, Davis, Markel & Edwards, New York City, for applicant Turner.

Jay Topkis, Allan Blumstein, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for ASCAP.

R. Bruce Rich, Evie C. Goldstein, Weil, Gotshal & Manges, New York City, for USA Network, Showtime, the Movie Channel, MTV, Lifetime TV, Discovery, CBN, Playboy and Black Entertainment.

Robert D. Joffe, Cravath, Swaine & Moore, New York City, for HBO.

Alan J. Hartnick, R. Charles Wright, Colton, Hartnick, Yamin & Sheresky, New York City, for Arts and Entertainment Cable Network.

Henry Ratner, Woodbury, N.Y.

Peter Shukat, Shukat & Hafer, New York City.

Allen H. Arrow, Arrow, Edelstein & Larid, P.C., New York City.

## MEMORANDUM AND ORDER

MICHAEL H. DOLINGER, United States Magistrate Judge:

This proceeding is an outgrowth of certain provisions of a Consent Decree (the "Decree") originally entered into in 1941 by the United States Department of Justice and the American Society of Composers, Authors and Publishers ("ASCAP"). The Decree, as amended in 1950, regulates the manner in which ASCAP licenses for public performance the copyrighted music of its members.

The applicants in this proceeding all function as so-called cable program suppliers. In brief, they each assemble a package of programming, which they typically transmit to numerous cable system operators. The system operators, which are licensed locally to operate in specified geographic areas, in turn transmit the programming over cable to the televisions of residents within their locale who pay subscription fees to be hooked up to the cable and receive the programming.

At present, the parties have presented to the court for decision two questions that require interpretation of portions of the Decree. The first is whether the Decree requires ASCAP to issue a public performance license to the cable program suppliers that covers not only the transmission of the suppliers' programming to the local cable system operators, but also the transmission of the programming by the system operators to the viewers.[1] The second is whether the Decree requires ASCAP to issue to the cable program suppliers, on demand, a so-called per-program license as an alternative to its more commonly used blanket license. For the reasons that follow, I conclude that the Decree requires ASCAP to make both of these licenses available to cable program suppliers.

## PROCEDURAL POSTURE

The current proceeding was initiated by the Turner Broadcasting System, Inc. ("TBS") on January 13, 1989. Although styled as an application for the setting of fees under Article IX(A) of the Decree, the petition principally sought a more preliminary form of relief—an order that ASCAP make available to TBS a performance license that covered the transmission of all of its programming "through to the viewer." Such a license—which ASCAP concedes it is required to issue to the traditional "over the air" networks—is commonly referred to as "licensing at the source," presumably because the license is issued to the entity that is the source of the programming. The applicants assert that the relief they seek is necessary because ASCAP announced in 1988, for the first time, that it would no longer agree to licensing at the source for the cable program suppliers—including TBS's three cable program-

---

1. Wholly apart from the system operators' transmission of programming to the public, the applicants require a license because their distribution of programming to the system operators is itself a public performance under the Copyright Act. *See, e.g., David v. Showtime/The Music Channel, Inc.,* 697 F.Supp. 752, 758–60 (S.D.N.Y. 1988). *Accord, Broadcast Music, Inc. v. Hearst/ABC Viacom Entertainment Services,* 746 F.Supp. 320, 328–29 (S.D.N.Y.1990).

ming services, Cable News Network, Headline News, and Turner Network Television—and would instead provide only a license that was limited to the program suppliers' transmission of their programming to local system operators; the license would therefore not cover the transmission of the programs by the system operators to the viewing public. In effect, ASCAP was asserting a right to demand licenses from both the program supplier and the system operator for the performance of ASCAP music as part of the programming on cable television channels.

TBS's application was ultimately joined by 16 other entities, all of which also supply programming to system operators for transmission to cable viewers. All of these cable program suppliers reported that they had been stymied in seeking a license from ASCAP that would cover the public performance of ASCAP music in programming distributed by them. In each instance, ASCAP had advised the suppliers that it did not believe itself bound to issue such a license to them, and that it intended to obtain separate licenses from both the cable program suppliers and the cable system operators.

ASCAP has moved for partial summary judgment, urging dismissal of that portion of the cable program suppliers' petitions that seeks an order compelling the issuance to them of a license that would cover programming transmissions by the system operators. ASCAP premises its motion on the contention that Article V(A) of the Decree, which requires ASCAP to issue such a license to "telecasting networks" for programming aired by the stations "affiliated" with such networks, does not cover cable program suppliers and their affiliated cable system operators. The applicants have opposed the motion, and although not formally cross-moving for summary judgment, have urged that the court grant their requested relief on the current motion.

After the briefing and argument of AS-CAP's motion, the parties agreed to broaden the scope of this proceeding to encompass another issue of decree interpretation. In the previously filed *Showtime/The Mov-*

*ie Channel* Article IX(A) proceeding, Showtime raised at trial the question of its entitlement under the Decree to a so-called per-program license from ASCAP. Ultimately, Showtime and ASCAP agreed to the withdrawal of that claim from the *Showtime* proceeding, and its resurrection in the current proceeding. Accordingly, the parties have agreed to expand the scope of ASCAP's previously filed summary judgment motion to encompass the question of whether cable program suppliers are entitled, under Article VII(B) of the Decree, to a per-program license as an alternative to a blanket license.

In supplemental briefing, the applicants have argued that they are "television broadcasters" within the meaning of Article VII(B) of the Decree, and hence are entitled to such a license. In response, ASCAP has pressed the argument that this term applies only to over-the-air or traditional television stations, and that accordingly it has no obligation to provide a per-program license to the applicants.

With the consent of the parties, the court invited the Department of Justice, as a co-signer of the Decree, to offer its views on both issues. On each issue, the Department—although not fully agreeing with ASCAP's interpretation of the Decree or its legal analysis—has concluded that the Decree does not obligate ASCAP to issue the types of licenses sought by the applicants.

THE EVOLUTION OF THE CONSENT DECREE

ASCAP is a membership association consisting of approximately 40,000 composers and music publishers. *American Society of Composers, Authors and Publishers v. Showtime/The Movie Channel, Inc.,* 912 F.2d 563, 573 (2d Cir.1990) (reproducing Memorandum and Order of the District Court). The members own copyrights in more than three million musical compositions, *see, e.g., id.,* and have authorized the Society to grant licenses for the public performance of those compositions.

Because the formation of ASCAP represented a pooling by the members of their copyrights for the purpose of obtaining a commercial advantage in dealing with mu-

sic users, ASCAP eventually attracted the attention of the Antitrust Division of the United States Department of Justice. In 1941, the Government filed suit in this court, alleging that ASCAP and its officers and members had conspired to restrain trade in violation of the Sherman Act. That suit was quickly settled by a Decree that imposed certain limitations on AS-CAP's licensing of the performance rights to its members' musical compositions. *See United States v. ASCAP,* 1940–43 Trade Cas. (CCH) ¶ 56,104 (S.D.N.Y. March 4, 1941).

In general terms, the 1941 Decree required that ASCAP's members give the Society only a non-exclusive agency to issue performance licenses, thus retaining for the members themselves the right to negotiate directly for such licenses or to assign that role to another person or entity. The Decree also prohibited ASCAP from "discriminating in price or terms between licensees similarly situated." *Id.,* Art. II(2).

The Decree addressed in some detail the manner in which ASCAP was to issue licenses for the performance of music by radio broadcasters. Thus, it prohibited AS-CAP from insisting on a license fee for commercial radio programs that was predicated in whole or part on the revenues received by the broadcaster from programs that contained no music licensed by AS-CAP. *Id.,* Art. II(3).[2] It also required ASCAP to issue to radio broadcasters, on request, a per-program license, and to quote fees for such a license that would not frustrate "the purpose of this subparagraph to afford radio broadcasters alternative bas[e]s of license compensation." *Id.*

The Decree further provided that ASCAP must issue licenses for "network radio broadcasting" that would cover, for a single license fee, "the simultaneous broadcasting of … performance[s] by all stations on the network." *Id.,* Art. II(4). Thus, ASCAP was prohibited from "requiring separate licenses for such several sta-

tions for such performance." *Id.* Similarly, the Decree required ASCAP to issue to producers or distributors of electronic transcriptions or other recordings a license that covered the public performance of recordings prepared for performance on any designated radio programs. In such a circumstance ASCAP would be barred from seeking a separate license from any radio stations designated by the licensee for the performance of the recording. *Id.,* Art. II(5).

The Decree contained additional limitations on ASCAP's licensing practices, including a requirement that it issue licenses on demand by "users other than broadcasters," *id.,* Art. II(6), and that it issue to "radio broadcasters," if so requested, "a license on a per performance or per program basis." *Id.,* Art. II(7). The Decree also prohibited ASCAP and its members from withholding from performance any composition in the ASCAP repertory for the purpose of extracting "additional consideration." *Id.,* Art. II(8).

The Decree also addressed a variety of internal ASCAP matters, including membership eligibility, the election of its Board of Directors, and the distribution of fees to the members. Finally, it provided for monitoring by the Department of Justice and continuing jurisdiction by this court. *Id.,* Arts. II(9), (10), (11); III, IV, VI.

The 1941 Decree was superseded in 1950 by a substantially revised agreement between the Government and ASCAP. *See United States v. ASCAP,* 1950–51 Trade Cas. (CCH) ¶ 62,595 (S.D.N.Y. March 14, 1950). The amendment of the Decree was apparently instigated by a number of related developments, two of which are of particular pertinence in this case. First, during the late 1940's, radio ceased to be the only broadcast medium available to American households. Although still in its infancy, television began to be recognized as a potentially significant transmitter of programming to the American public. It therefore became necessary to address the

---

**2.** The same provision prohibited ASCAP from insisting on a license fee which "does not vary in proportion either to actual performances" of ASCAP music during the license term "or to the number of programs on which such compositions shall be performed; …" *Id.*

manner in which its use of copyrighted music would be licensed by ASCAP.

Second, in 1948 two federal courts were confronted with an antitrust challenge to the manner in which ASCAP was licensing the performance rights to copyrighted music incorporated in motion pictures. The controversy focussed on ASCAP's practice of granting movie producers solely the right to incorporate the music on the soundtrack of the film—the so-called synchronization right—while withholding the right to perform the music publicly when the film was played in movie theatres. Rather than granting both rights to the movie producers, ASCAP insisted that each local film exhibitor separately obtain a public performance license for the films played in its theatres.

The movie exhibitors challenged this practice, and in 1948 Judge Leibell in this court and Judge Nordbye in the District of Minnesota both concluded that ASCAP's practice of splitting the rights necessary to exhibit the films constituted a violation of the Sherman Act. *See Alden-Rochelle Inc. v. ASCAP*, 80 F.Supp. 888, 893–95 (S.D.N.Y.1948); *M. Witmark & Sons v. Jensen*, 80 F.Supp. 843, 848–50 (D.Minn. 1948). In consequence, Judge Leibell enjoined ASCAP from dealing with the film exhibitors in the licensing of ASCAP music for public performance in films. *Alden Rochelle Inc. v. ASCAP*, 80 F.Supp. 900, 903–05 (S.D.N.Y.1948).

In the wake of these developments, the Justice Department and ASCAP undertook negotiations to modify the 1941 Decree. *See generally* Timberg, "The Antitrust Aspects of Merchandising Modern Music: The ASCAP Consent Judgment of 1950", 19 J.Law & Contemp.Probs. 294, 299–306 (1954). The final version of the amended Decree was presented in March 1950 to Judge Goddard, who had overseen the original 1941 Decree, and he approved it.[3]

The 1950 Decree contains a number of significant changes from its predecessor.

The most prominent of these involve the expansion of its terms to cover television, the incorporation of provisions designed to address the issues raised in *Alden-Rochelle*, and the creation of a so-called rate court, with attendant terms governing the procedures for obtaining a license and court determination of any disputes concerning fees.

Under the terms of the 1950 Decree, ASCAP must issue a license to "any user" who makes a written request for it, but may not issue, except on written request, a license limited to specific compositions in its repertoire. 1950 Decree, Art. VI. The Decree also specifies certain licensing requirements for specific types of users. Thus, in connection with motion pictures, the Decree embodies the holding of *Alden-Rochelle* and *Witmark* by requiring AS-CAP to issue to the movie producer, on demand, "a single license of motion picture performance rights" for the entire United States, *id.*, Art. V(C), and barring ASCAP from negotiating with or collecting money from "any motion picture theatre exhibitors" concerning motion picture performance rights. *Id.*, Art. IV(E).

As for the broadcast media, they are treated together with wired music services, and the relevant provisions are those centrally at issue in this case. Thus, Article V(A) represents a modified version of the 1941 provision governing licensing at the source:

> Defendant ASCAP is hereby ordered and directed to issue, upon request, licenses for rights of public performance of compositions in the ASCAP repertory as follows:
>
> (A) To a radio broadcasting network, telecasting network or wired music service ..., on terms which authorize the simultaneous and so-called "delayed" performance by broadcasting or telecasting, or simultaneous performance by wired music service, as the case may be, of the ASCAP repertory

---

**3.** The Decree was also submitted to Judge Leibell, with explanatory memoranda from the parties, because it addressed the issues that he had dealt with in *Alden-Rochelle* and was intended

in part to supplant the injunctive relief he had awarded, thereby mooting ASCAP's then-pending appeal from his decision.

by any, some or all of the stations in the United States affiliated with such radio network or television network or by all subscriber outlets in the United States affiliated with any wired music service and [t]o not require a separate license for each station or subscriber for such performances; ....

The Decree also reincorporates the old "licensing at the source" requirement with respect to manufacturers, producers and distributors of recordings, and thus limits ASCAP to a single license for recordings that are "recorded for performance on specified commercially sponsored radio programs or television programs ..." In such a case, the license to the manufacturer, producer or distributor is to cover the broadcasting of the recording "by all radio stations or television stations in the United States enumerated by the licensee without requiring separate licenses for such enumerated stations for such performance." *Id.*, Art. V(B).

In a separate set of provisions addressed to the licensing of public performance rights for "radio broadcasting and telecasting," ASCAP is prohibited—as it was in the 1941 Decree in connection with radio broadcasting—from imposing fees for commercial programming based upon a percentage of income received by the licensee from programs with no ASCAP music, unless requested by the licensee. *Id.*, Art. VII(A). ASCAP is also required to issue per-program licenses "to any unlicensed radio or television broadcaster, upon written request." *Id.*, Art. VII(B). Under the terms of the Decree, the fees for such a license for commercial programs may be based, at the option of ASCAP, either on a fixed payment per program or on a percentage of the revenues paid by the sponsors of the program. *Id.*, Art. VII(B)(1).[4]

In provisions of more general applicability, the Decree reiterates the requirements of its predecessor that ASCAP receive from its members only a non-exclusive right to negotiate for performance rights.

*Id.*, Art. IV(B). It also contains two anti-discrimination provisions. One prohibits ASCAP from entering into any license "which discriminates in license fees or other terms and conditions between licensees similarly situated." *Id.*, Art. IV(C). The other directs ASCAP "to use its best efforts to avoid any discrimination among the respective fees fixed for the various types of licenses which would deprive the licensees or prospective licensees of a genuine choice from among such various types of licenses." *Id.*, Art. VIII.

As noted, the Decree also establishes a set of procedures for fee-setting. Article IX(A) requires ASCAP, on receipt of a written license application, to advise the applicant in writing "of the fee which it deems reasonable for the license requested." If the parties cannot agree on a fee within sixty days, the applicant may apply to the court for the setting of "a reasonable fee." The Decree also provides that if the court sets a fee, ASCAP must offer "a license at a comparable fee to all other applicants similarly situated who shall thereafter request a license." *Id.*, Art. IX(C).

Finally, as with its predecessor, the 1950 Decree contains a series of provisions governing the membership and management of ASCAP, voting rights, distribution of fees, and other matters relating to internal administration, as well as a provision for the continuing jurisdiction of this court. *Id.*, Arts. IV(E), X–XVII.

ANALYSIS

ASCAP seeks summary judgment with respect to both of the applicants' requests for relief. Insofar as the applicants seek an order requiring a "through to the viewer" license under Article V(A) of the 1950 Decree, ASCAP argues principally that the applicants are not "telecasting networks" and the cable system operators are not "affiliated stations" within the meaning of Article V(A) of the Decree, and are therefore not entitled to such licensing at the source. ASCAP rests this argument on the conceded differences in the technology of

---

**4.** For sustaining programs, ASCAP may opt for a flat fee for each licensed program or a percentage of the rate card that would have been applicable if the program had been commercial. *Id.*, Art. VII(B)(2).

cable and over-the-air television transmission and certain acknowledged dissimilarities between the financial arrangements found in the traditional over-the-air television industry and in the far newer cable television industry. Since cable television did not exist in 1950, ASCAP suggests, the drafters of the Decree could not have intended to include those novel entities within the language of the Decree.

As for the per-program issue, ASCAP again rests its argument principally on the notion that cable television is a new form of mass communication. Accordingly, ASCAP urges that it was not intended to be covered by the term "television broadcaster" found in Article VII(B) of the Decree.

In resisting these arguments, the applicants suggest that the differences between the manner of operation of the over-the-air networks and the cable program suppliers are immaterial in view of the purposes of the Decree, and particularly the purposes of Articles V(A) and VII(B). They invoke the asserted functional equivalence of the original television networks and the cable program suppliers, and suggest as well that the Decree was designed to be forward-looking and to encompass all forms into which the television industry, which was still in its infancy in 1950, might thereafter evolve.

Specifically with respect to the licensing-at-the-source question, the applicants assert, as an alternative argument, that even if the term "telecasting network" is narrowly defined, they should nonetheless be entitled to the same form of license as the Decree guarantees to the traditional television networks based on the anti-discrimination provision of Article IV(C). The applicants also invoke the language of Article IX, which requires ASCAP to quote a fee on demand "for the license requested." They contend that this language entitles them, at a minimum, to any reasonable form of license that they may request, even if it is not otherwise required by the Decree.

Finally, on the question of the per-program license, the applicants also cite the anti-discrimination provision of Article VIII. Specifically, they argue that it underscores the drafters' intention that all "licensees" be given "a genuine choice" among the various types of licenses, including the per-program license.

Before addressing these arguments, I briefly summarize the legal standards that govern the resolution of these matters.

## A. *Standards for Summary Judgment*

For ASCAP to prevail on its motion, it must satisfy the court that there is no dispute as to any material fact and that, based on the undisputed facts, it is entitled to judgment as a matter of law. *See, e.g., Montana v. First Federal Savings & Loan Ass'n,* 869 F.2d 100, 103 (2d Cir.1989); *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987); *Falls Riverway Realty, Inc. v. Niagara Falls,* 754 F.2d 49, 54 (2d Cir.1985). It is axiomatic that the role of the court on such a motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d at 11; *Eastway Constr. Corp. v. New York,* 762 F.2d 243, 249 (2d Cir.1985), *cert. denied,* 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987). *See, e.g., Parsons v. Honeywell, Inc.,* 929 F.2d 901, 904 (2d Cir.1991); *Branum v. Clark,* 927 F.2d 698, 704 (2d Cir. 1991); *Twin Laboratories, Inc. v. Weider Health & Fitness,* 900 F.2d 566, 568 (2d Cir.1990); *Montana v. First Fed. Sav. & Loan Ass'n,* 869 F.2d at 103; *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 465 (2d Cir.1989).

The movant bears the initial burden of informing the court of the basis for its motion and identifying those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). *Accord, e.g., Citizens Bank of Clearwater v. Hunt,* 927 F.2d 707,

710 (2d Cir.1991). If the movant fails to meet its burden, the motion must be denied even if the opposing party does not submit any evidentiary matter to establish a genuine factual issue for trial. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970).

If the movant carries its initial burden, the burden shifts to the party opposing the motion to demonstrate a genuine dispute as to one or more of the material facts. *Celotex Corp. v. Catrett*, 477 U.S. at 322, 106 S.Ct. at 2552. *See also Citizens Bank of Clearwater v. Hunt*, 927 F.2d at 710; *Greater Buffalo Press, Inc. v. Federal Reserve Bank of New York*, 866 F.2d 38, 42 (2d Cir.), *cert. denied*, 490 U.S. 1107, 109 S.Ct. 3159, 104 L.Ed.2d 1022 (1989). In responding to the motion, the opposing party cannot simply rely on its pleadings or on conclusory factual allegations, or on conjecture as to the facts that discovery might disclose. *See, e.g., Gray v. Town of Darien*, 927 F.2d 69, 74 (2d Cir.1991). Rather, the opposing party must present specific evidence in support of its contention that there is a genuine dispute as to the material facts. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. at 324, 106 S.Ct. at 2553; *Twin Laboratories v. Weider Health & Fitness*, 900 F.2d at 568; *Montana v. First Fed. Sav. & Loan Ass'n*, 869 F.2d at 103; *Knight v. U.S. Fire Ins. Co.*, 804 F.2d at 12; *L & L Started Pullets, Inc. v. Gourdine*, 762 F.2d 1, 3–4 (2d Cir.1985). To demonstrate a "genuine dispute," the opposing party must come forward with enough evidence to justify a reasonable jury returning a verdict in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986); *Citizens Bank of Clearwater v. Hunt*, 927 F.2d at 710; *Cinema North Corp. v. Plaza at Latham Associates*, 867 F.2d 135, 138 (2d Cir.1989).

**B.** *The "Licensing at the Source" Claim*

ASCAP argues that the Decree should be read as a contract; that, so read, it unambiguously precludes cable program suppliers from the protection of Article V(A)—which governs radio broadcasting networks, telecasting networks and wired music services—and that therefore summary judgment should be granted in its favor on this portion of the applicants' petition. As will be seen, I conclude that the language of Article V(A) does not unambiguously support ASCAP's reading, and that with the guidance of appropriate aids to construction, it becomes apparent that in fact the applicants are covered by Article V(A). In view of this conclusion, and the absence of any disputed issues of material fact, the court will enter summary judgment for the applicants on this claim.

1. Interpreting a Consent Decree

We start by noting that, in general terms, ASCAP is correct in asserting that the courts will interpret decrees with the same tools as are utilized in the construction of private contracts. This follows from the fact that "[a] consent judgment, though it is a judicial decree, is principally an agreement between the parties." *S.E.C. v. Levine*, 881 F.2d 1165, 1178 (2d Cir.1989). Accordingly, decrees are generally to be interpreted consistently with their "plain meaning" or "explicit language." *See, e.g., United States v. Atlantic Refining Co.*, 360 U.S. 19, 22–23, 79 S.Ct. 944, 946, 3 L.Ed.2d 1054 (1959); *Suarez v. Ward*, 896 F.2d 28, 30 (2d Cir.1990); *Berger v. Heckler*, 771 F.2d 1556, 1568 (2d Cir.1985).

The point of this oft-cited observation, and of the frequent admonition to read decrees within their "four corners", is that the decree "represents a compromise between parties who have waived their right to litigation and, in the interest of avoiding the risk and expense of suit, have give[n] up something they might have won had they proceeded with the litigation...." *Berger v. Heckler*, 771 F.2d at 1568 (quoting *United States v. Armour & Co.*, 402 U.S. 673, 681, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971)). Thus, we are warned that "the scope of the decree must be discerned within its four corners, and not by reference to what might satisfy the pur-

poses of one of the parties to it." *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 574, 104 S.Ct. 2576, 2585, 81 L.Ed.2d 483 (1984). *Accord, e.g., S.E.C. v. Levine*, 881 F.2d at 1178–79; *Berger v. Heckler*, 771 F.2d at 1568. To do otherwise, by ignoring plain language and meaning, would deprive one of the parties to the decree of the benefits for which he bargained and in . exchange for which he "waived his right to litigate the issues raised, a right guaranteed to him by the Due Process Clause." *United States v. Armour & Co.*, 402 U.S. at 682, 91 S.Ct. at 1757. *Accord, e.g., S.E.C. v. Levine*, 881 F.2d at 1181.

▮ Notwithstanding the stringency of these strictures, they necessarily are limited to cases in which the relevant provisions of the decree have a clear and unambiguous meaning. If the language utilized has only one reasonable interpretation, *see generally Burger King Corp. v. Horn & Hardart Co.*, 893 F.2d 525, 528 (2d Cir. 1990); *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9–10 (2d Cir.1983), then the court must look exclusively to the language found in the decree. *See United States v. Armour & Co.*, 402 U.S. at 680–83, 91 S.Ct. at 1756–58. If, however, the wording is susceptible to more than one reasonable construction, then the court must look to extrinsic evidence, as is the case with ambiguous contracts. *See, e.g., United States v. ITT Continental Baking Co.*, 420 U.S. 223, 238, 95 S.Ct. 926, 935, 43 L.Ed.2d 148 (1975); *S.E.C. v. Levine*, 881 F.2d at 1179; *Schurr v. Austin Galleries of Illinois, Inc.*, 719 F.2d 571, 575 (2d Cir.1983). As noted by the Supreme Court in *ITT*,

[s]uch aids include the circumstances surrounding the formation of the consent order, any technical meaning words used may have had to the parties, and any other documents expressly incorporated in the decree.

420 U.S. at 238, 95 S.Ct. at 935.[5]

▮ The reference in *ITT* to "the circumstances surrounding the formation of

the consent order" encompasses not only traditional parol evidence—that is, the representations made by the negotiators to each other in the course of the negotiations, *see e.g., Roberts v. Consolidated Rail Corp.*, 893 F.2d 21, 24 (2d Cir.1989); *Pantone, Inc. v. Esselte Letraset Ltd.*, 691 F.Supp. 768, 774 (S.D.N.Y.1988), *aff'd*, 878 F.2d 601 (2d Cir.1989)—but also any meaningful indicia of the purpose, if any, of the contested provision. This point was made, somewhat elliptically, by the Supreme Court in *ITT* when it took pains to distinguish its prior comment in *United States v. Armour & Co.* that "the *decree* itself cannot be said to have a purpose; rather the *parties* have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve." 402 U.S. at 681–82, 91 S.Ct. at 1757 (emphasis in original). As the Court noted in *ITT*, this comment, and similar remarks found in *United States v. Atlantic Refining Co.*, 360 U.S. at 22–23, 79 S.Ct. at 946, and *Hughes v. United States*, 342 U.S. 353, 356–57, 72 S.Ct. 306, 308, 96 L.Ed. 394 (1952), all were made only after the Court had found the disputed decree language to be unambiguous. Therefore, the Court in those cases was in effect simply declining to change the parties' prior bargain to serve the asserted policies of the statute under which the decree had been entered. *See* 420 U.S. at 235–37, 95 S.Ct. at 933–35. The obvious point is that if the defendant did not bargain for unambiguous language precluding the competing interpretation, the court is not limited in what data it may look to in discerning the proper meaning of the decree, and in particular it may look to equitable considerations that flow from the statute underlying the decree and the fact that, in this respect, the decree is a court order as well as a contract. *See, e.g., United States v. American Cyanamid Co.*, 719 F.2d 558, 564 (2d Cir.1983), *cert. denied*, 465 U.S. 1101, 104 S.Ct. 1596, 80 L.Ed.2d 127 (1984).

---

**5.** Even if the words of the decree permit only one reasonable interpretation, extrinsic evidence may be appropriate if it is unclear whether the unambiguous provision applies to the set

of facts presented by the case. *See e.g., White v. Roughton*, 689 F.2d 118, 119–20 (7th Cir.1982), *cert. denied*, 460 U.S. 1070, 103 S.Ct. 1524, 75 L.Ed.2d 947 (1983).

The Court in *ITT* further distinguished the three earlier cases by noting that in each of them the Government was seeking to punish past conduct by the defendant, whereas in *ITT* the parties were seeking simply to define the parameters of required future conduct by the defendant under the decree. *Id.* 420 U.S. at 237, 95 S.Ct. at 935. This point is of course consistent with case-law that has required that criminal statutes and injunctions be sufficiently specific to guide the defendant's conduct before he may be punished for non-compliance. *See, e.g., Kolender v. Lawson,* 461 U.S. 352, 357–58, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983); *Pasadena City Bd. of Educ. v. Spangler,* 427 U.S. 424, 438–39, 96 S.Ct. 2697, 2705–06, 49 L.Ed.2d 599 (1976).

These same two distinctions have since been echoed by the Second Circuit, which has also emphasized that where the decree language is ambiguous and all that is at issue is future conduct, "a court of equity may, in construing the provision, consider the purpose of the provision in the overall context of the judgment at the time the judgment was entered." *United States v. American Cyanamid Co.,* 719 F.2d at 564. *Accord, e.g., United States v. Western Elec. Co.,* 894 F.2d 1387, 1391–92 (D.C.Cir. 1990). *See also ASCAP v. Showtime/The Movie Channel, Inc.,* 912 F.2d at 570 (noting that "context" of 1950 Decree reflects intent to "disinfect" ASCAP "as a potential combination in restraint of trade....") (quoting *K–91, Inc. v. Gershwin Publishing Corp.,* 372 F.2d 1, 4 (9th Cir.1967), *cert. denied,* 389 U.S. 1045, 88 S.Ct. 761, 19 L.Ed.2d 838 (1968)); *cf. United States v. County of Nassau,* 907 F.2d 397 (2d Cir. 1990) (*per curiam*) (affirming refusal to modify decree, in part based on conclusion that change "would undermine the purpose of the decree").

With an eye to these general standards, I turn to the parties' respective interpretations of Article V(A).

2. Are the Applicants Covered by Article V(A)?

a. *The Purpose and Context of Article V(A)*

■ As noted, ASCAP presses the view that the coverage of the terms "telecasting network" and "stations ... affiliated with such ... television network" should be limited to the three major over-the-air networks—ABC, CBS and NBC—all of which were in existence when the Decree provision in question was drafted and approved, and should certainly not extend to the applicants. In advancing this conclusion, AS-CAP seems to make two slightly different, yet related, arguments. First, it suggests that since cable television was not yet contemplated, much less developed, by 1950, the drafters of the Decree could not have intended to include it within the scope of Article V(A). Second, ASCAP argues that in any event the method of operation of the applicants is so different, both technologically and financially, from the over-the-air television networks that they belong to an entirely different genus of mass media, and hence are not covered by the Decree.

We start our analysis of ASCAP's first argument by noting that the relevant language of Article V(A) is ambiguous. The Decree refers to "a ... telecasting network," rather than, for example, "one of the existing television networks" or "a network that engages in telecasting by over-the-air broadcast," and it does not define or otherwise explain this term in any respect. Although it is conceivable from the wording that the drafters may have intended to cover only the then-existing three networks, or only such entities as thereafter operated in virtually the same technological and financial manner, that reading is not compelled by the language used. An alternative reading, which is at least equally plausible solely from the face of the Decree, is that this provision was intended to cover any entity that—like the then-existing networks—assembled a unique package of television programming which it supplied to a number of locally-based telecasters with which it maintained a contractual relationship, and which in turn transmitted that programming, under the program supplier's name, to the televisions in its locality. So construed, the Decree would cover the cable program suppliers.

ASCAP's principal argument is that the cable program suppliers are in fact so dif-

ferent from the over-the-air networks as to preclude application of Article V(A) to them. Again, the wording of the Decree is certainly not self-explanatory, and hence our evaluation of this argument requires a review of some aspects of the drafting and approval of the Decree.

As noted, the 1941 Decree, although imposing some restrictions on ASCAP's licensing methods generally, embodied specific limitations solely with respect to only one medium of mass communication, the radio industry. Among the limitations imposed on ASCAP in its dealings with radio broadcasters was the requirement that it must issue licenses to the radio networks that would encompass the performance of network programming "by all stations on the network," and that it must refrain from seeking a separate license from the local stations for such programming. (1941 Decree at Art. (II)(4).)

Although the Decree does not explicitly state the reason for the inclusion of this requirement, it is not difficult to discern in context. ASCAP became a target of the Government because of its potential ability to control a significant portion of the market for music used in non-dramatic public performances, whether on radio or in other settings. In the context of a network-affiliate relationship, such potential control could be very effectively exploited to extract non-competitive fees by the simple expedient of demanding not only a license from the network—which conceivably has some bargaining power by virtue of its ability to control the choice of music to be included in its network programming—but also a separate license from each of the affiliated stations, which lack this leverage since they do not control what music is included in the network programming that they air. Indeed, the Government's 1941 complaint alleged this precise form of abuse. (*See* Complaint at pp. 7–8, 14–15, attached to USA Network Memorandum in Opposition at Exh. F.) By limiting ASCAP to a license with the radio networks themselves, Article II(4) balanced the playing field to a degree and spared the local stations from facing the unenviable choice of either paying whatever ASCAP demanded or foregoing network programming.

This interpretation is given added support both from other language in the 1941 Decree and from later history. Article II(3) of the 1941 Decree required ASCAP to offer radio broadcasters a per-program license on request on terms that would not frustrate "the purpose of this subparagraph to afford radio broadcasters alternative bas[e]s of license compensation." This language explicitly confirms the obvious— that the Decree was designed to limit ASCAP's ability, by pooling copyrights for large amounts of music used in radio broadcasting, to extract unreasonable fees for performance of the music. The availability of per-program licenses, if reasonably priced as compared to the alternative blanket license, was one means of accomplishing this purpose, since it gave the broadcaster the ability to minimize its fees either by limiting the number of programs on which it played ASCAP music, or possibly by seeking direct licensing from the composers, *see, e.g., Buffalo Broadcasting Co. v. ASCAP*, 744 F.2d 917, 926 n. 7 (2d Cir.1984), *cert. denied*, 469 U.S. 1211, 105 S.Ct. 1181, 84 L.Ed.2d 329 (1985), a possibility that was kept at least theoretically alive by the additional requirement that ASCAP members give the Society only a non-exclusive agency to license their music. (1941 Decree at Art. II(1).) The stated purpose of the per-program requirement thus accords fully with our understanding of the purpose of the "licensing at the source" provision.

Subsequent events underscore our reading of Article II(4) of the 1941 Decree and offer a clearer view of the intended scope of the equivalent provision in the 1950 Decree. As noted, ASCAP, although precluded by the 1941 Decree from splitting the performance rights in network radio programming, proceeded to use essentially the same technique in connection with the film industry. As recapitulated in *Alden–Rochelle*, ASCAP licensed only the "synchronization" right to the movie producer, and insisted on separate licenses for the performance rights to the music from all local movie theatre exhibitors. *See Alden–Ro-*

*chelle v. ASCAP*, 80 F.Supp. at 894. This practice was condemned as an antitrust violation both in *Alden–Rochelle* and in the parallel Minnesota litigation, *M. Witmark & Sons v. Jensen*, because it enabled AS-CAP to extract extortionate fees from the exhibitors, since they faced the same choice as the local radio stations before the 1941 Decree—either pay what ASCAP demanded or forego any films or programming that incorporated ASCAP music.[6]

It was apparently the holding of *Alden–Rochelle* and the emergence of television as a new medium of mass communication, as well as complaints to the Justice Department about the adequacy of the 1941 Decree, that gave impetus to the 1950 amendments to the Decree. (March 13, 1950 Tr. at 2, 7–8, annexed to ASCAP Memorandum). In this historical context, the 1950 Decree added provisions explicitly incorporating *Alden–Rochelle*-type relief for the movie industry and extended the specific protections of the 1941 Decree—including both the requirement for one license to cover the public performance of network programming and the availability of per-program licenses to radio broadcasters—to all forms of mass communication known at the time that might utilize significant amounts of ASCAP music. This effort at inclusiveness is apparent both from the face of the Decree and from the contemporaneous representations of the negotiators.

As noted, the Decree addresses radio, motion pictures, wired music and television, and it contains no language limiting its application to defined segments of any of these industries. Accordingly, on its face the Decree appears to apply to television programming transmitted to the public irrespective of the technology used to make the transmission. Furthermore, the language of Article V(A) can most fairly be read to cover not only any technology for transmission of television programming into the home, but also any financial arrangement between the original packager of programming identified with the packag-

er and the entity that transmits that packaged programming to television viewers. The problem that Article V(A) addresses is potentially found whenever programming is packaged by an entity for transmission to the public by another entity, and the solution adopted by the Decree rests on the fact that the packager has greater ability to negotiate on equal terms with ASCAP than does the affiliated telecaster. These considerations are not at all affected by the technology of transmission or by the financial arrangements between the two entities.

The contemporaneous statements of the negotiators underscore these conclusions. First, each side acknowledged internally, to each other and to the court that a primary impetus for the 1950 amendment process was the *Alden–Rochelle* holding. (*See, e.g.*, ASCAP Memorandum to Hon. Vincent L. Leibell at 1–2, attached to Affidavit of Bruce D. Sokler, Esq., sworn to July 17, 1989, at Exh. E.) As noted, the central problem addressed by *Alden–Rochelle* was the unfair advantage obtained by ASCAP in splitting the rights between the producer and the exhibitor. This same problem was inherent in both the radio and the television industries to the extent that program suppliers fed packaged programming to affiliated local entities for broadcast, and yet could not compel ASCAP to issue a license through to the ultimate audience for that programming. It is thus not surprising to find the original 1941 protection of the radio networks re-incorporated in the 1950 Decree and extended to television and wired music—the other industries in which the same potential for abuse could be found—as well as to the movie industry in a somewhat different form, which took account of the specific holding in *Alden–Rochelle*.

Second, it is evident from the contemporaneous documentation that both sides viewed the Decree as covering television as a generic means of program transmission. In the Spring of 1949 the parties were

6. In theory, the film exhibitors could have sought direct licensing from the composers, but it can fairly be assumed that this would have been impracticable, in view of the evident self-

interest of ASCAP members in relying on the bargaining leverage that ASCAP wielded. *See ASCAP v. Showtime/The Movie Channel,* 912 F.2d at 570.

discussing a proposed amended version of the Decree which would include a broader provision for licensing through to the viewer than existed in the 1941 Decree. This provision was separate from one that incorporated the *Alden–Rochelle* holding specifically with respect to the movie industry, and included general references to "telecasting" and "television." Thus, as early as March 1949, in an internal Justice Department memorandum, the Department's principal negotiator, Sigmund Timberg, noted that ASCAP had already agreed to a provision requiring, for motion pictures, that licensing of performing rights be done solely through the movie producers, thus in effect concurring with the holding in *Alden–Rochelle*. Timberg went on to note:

> This should be done not only for the motion picture and radio industries, which to date have been the primary complainants against ASCAP's activities, but seems desirable for any other industry where it is feasible to collect royalties in a similar manner. Such a provision would, of course, simplify ASCAP's administrative operations.

(Memorandum dated March 8, 1949 from Sigmund Timberg to Herbert A. Bergson at 2, attached to USA Network Memorandum at Exh. H.) Thus, early in the negotiations, the Department was apparently seeking to require licensing at the source in all situations where it could be applied.

Significantly, only a short time later, ASCAP apparently concurred in this broad approach. Thus, in another internal Justice Department memorandum, Timberg referred to ASCAP's draft proposal and observed:

> This rider, along with the other new references to telecasting and television inserted on pages 4 and 5, is intended to lay the basis for licensing at the source by ASCAP for industries other than the

motion picture industry. Defense counsel tell me that these industries exhaust the industrial situations where licensing at the source is feasible.

(Memorandum dated May 2, 1949 from Sigmund Timberg to Harold Lasser and Beatrice Rosenberg at 2, attached to USA Network Memorandum at Exh. B.) In short, both sides understood that the "licensing-at-the-source" principle was to be imposed wherever the split rights problem was posed.

Later, in July 1949, one of the ASCAP attorneys memorialized in a memorandum a meeting between representatives of the Department and of ASCAP in which the details of agreed-upon terms were discussed. In the course of the summary, the writer recounted that ASCAP was to prepare a new draft embodying the agreed-upon provisions, and noted as one of the points that "[r]adio and television [are] to be treated alike for purposes of [the] Decree." (Memorandum to the file dated July 6, 1949 at 3, attached to USA Network Memorandum at Exh. E.) Again, although this point seems fairly obvious from the ultimate Decree presented to the court, the language in the memorandum reinforces the evident understanding of the parties that television was being treated as a generic industry, and thus that the protections afforded in the Decree were intended to reach as far as the potential harms identified either in the prior Decree or in the *Alden–Rochelle* decision.[7]

Several weeks later, in what was apparently their next meeting, the negotiators continued to debate the extent to which the *Alden–Rochelle* holding should serve to bar any efforts by ASCAP or its members to license movie exhibitors. At that time, ASCAP apparently was taking the position that its members should be able to seek

---

7. These observations are fully supported by additional documentation in the record. Thus, a January 1949 memorandum notes that ASCAP's counsel was seeking to address the *Alden–Rochelle* holding in the consent decree, and had suggested certain changes in an earlier draft to accomplish this. At the same time, Mr. Timberg "suggested consideration" of a "[b]roader application of the principle of collecting from the primary user," an evident reference to the application of the *Alden–Rochelle* principle beyond the movie industry. That comment plainly foreshadows the later willingness of the two sides to bar the splitting of rights in any industry in which such a practice might occur. (*See* Memorandum to the files from W.D. Kilgore, Jr., dated Jan. 24, 1949, attached to USA Network Memorandum at Exh. M.).

such licenses directly, whereas the Department of Justice was seeking to bar any ASCAP involvement in the acquisition of performance licenses for music in movies. Although this point was not yet resolved, ASCAP at this time agreed to the principle of "licensing at the source" for other music uses. As noted in a memorandum, "[t]his development, which will affect the motion picture, radio, wired music and electrical transcription industries, is socially desirable." (*See* Memorandum dated July 22, 1949, from Sigmund Timberg to Herbert A. Bergson at 1–2, attached to USA Network Memorandum at Exh. L.)

Subsequently, the intention of the Department of Justice to apply the basic holding of *Alden–Rochelle* more broadly was reiterated in connection with a proposed revision of the July 1949 draft amended Decree. As noted in an August 1949 internal Department memorandum, "while the 1941 Decree was entered at a time when radio licensing was of major importance, it is intended that the new judgment include television and such modification as will eliminate the practices found to be illegal in the *Alden–Rochelle* case." (*See* Memorandum dated August 29, 1949 from Harold Lasser and Beatrice Rosenberg to Sigmund Timberg, attached to USA Network Memorandum at Exh. I.) This internal memorandum is not direct evidence of the meaning of the Decree, and in fact the revised version that it discussed was ultimately modified, in particular to retain in ASCAP the non-exclusive right to license music in motion pictures, albeit not from motion picture exhibitors. Nonetheless, the general observations made are consistent with the prior negotiations, with the final version of the Decree presented to the court in March 1950, and with the representations made to the court in connection with that presentation.

As noted, the final version of the Decree gave ASCAP the right to license performance rights in motion pictures, but barred such licensing of film exhibitors. At the same time, it extended to the television and wired music industries the principle embodied in the 1941 Decree with respect to radio and in the 1948 *Alden–Rochelle* holding,

that ASCAP and its members could not split performance rights—or performance and synchronization rights, where applicable—and thereby compel the ultimate exhibitor of programming assembled by a supplier to pay for a separate performance rights license.

In presenting the proposed Decree to Judge Leibell, the Department's memorandum noted that the Decree sought to address issues raised in *Alden–Rochelle* with respect to the motion picture industry, "some of which, of course, are of general applicability to ASCAP's activities in other fields," as well as complaints made both by ASCAP members and by "the users of ASCAP music" concerning the operation of the 1941 Decree. (*See* Memorandum to the court at 2–3, attached to Sokler Aff. at Exh. C.) After reviewing those new provisions that were intended specifically to enforce *Alden–Rochelle*, the Government turned "to other provisions, not directly related to motion picture licensing, which in our judgment eliminate actual or potential restraints suggested by the Department's inquiry." (*Id.* at 7.) After reviewing a number of other terms, it turned to Article V, which it described as "[g]eneral licensing at the source." (*Id.* at 8.) In explaining this set of provisions, the Department's memorandum made plain that the underlying principle was the same as embodied in the *Alden–Rochelle* decision, and that it was intended to be applied in other industries as well, where the same problems could be anticipated:

The 1941 Decree required ASCAP to license performances on radio networks on a basis which permitted the network to obtain a single license for performance by all affiliated stations. (*Sec.* II(4)). A similar provision covers the performance of electrical transcriptions. (*Sec.* II(5)). This principle, known as "licensing at the source," impresses us as being strongly in accord with the rationale of the *Alden–Rochelle* opinion. After a study of the needs of the other users of ASCAP music, it was concluded that "licensing at the source" should be made possible, not only for the radio industry, but for tele-

vision networks, wired music services (such as the organization known as "Muzak"), and motion pictures. (*Sec.* V(A), (B) and (C) of the proposed Judgment). (*Id.*) This commentary, including its references to "the needs of the other users of ASCAP music", makes it evident, once again, especially when viewed in light of the negotiating history, that the parties were agreeing to apply the "licensing at the source" principle—more precisely, licensing solely from the originator of the program rather than from its ultimate exhibitor—to all industries in which it was potentially applicable.

This characterization is entirely consistent with ASCAP's own March 1950 memorandum to Judge Liebell, in which it also reviewed the terms of the proposed 1950 Decree and its impact on the *Alden–Rochelle* judgment. (*See* Sokler Aff. at Exh. E.) In describing the Decree, ASCAP's counsel noted that it had its origin in the *Alden–Rochelle* litigation (*id.* at 1–2) but that it contained significantly broader terms. ASCAP thus noted that the Decree provided for "licensing at the source" (*id.* at 3), a concept that it referred to later in discussing "Limitations on Licensing." (*Id.* at 7.) In explaining these "limitations" generally, ASCAP observed:

> The proposed judgment imposes numerous limitations upon ASCAP's licensing of performing rights in order to assure to users of music complete freedom of choice in obtaining a license to perform some, all or any one of the musical compositions in the ASCAP repertory at a fair and non-discriminatory rate.

(*Id.*) The ASCAP memorandum then proceeded briefly to describe each of these limitations, including Article V, which it characterized as a requirement that AS-CAP

> must grant to radio broadcasting and telecasting networks or wired music services or to the manufacturer, producer or distributor of a transcription or recordation of a composition in ASCAP's repertory for performance on specified commercial programs on an electrical transcription and to any person engaged

in producing motion pictures, a so-called "clearance at the source" license. (V(A), (B), (C)).

(*Id.* at 7–8.) Finally, in a concluding justification for the amended Decree, ASCAP borrowed language from the Ninth Circuit in *Cutter Laboratories, Inc. v. Lyophile–Chryochem Corp.*, 1948–51 Trade Reg. Rep. (CCH) ¶ 62,542 (9th Cir.1948), and stated that the proposed Decree

> will secure to any would-be licensee an opportunity to procure just the license he wishes and no more, at reasonable non-discriminatory royalties without making any agreement as to pricing or as to the use or sale of films, programs or records using copyrighted music.

(*Id.* at 14–15.) In sum, the written comments of counsel for both the Government and ASCAP to the court at the time of the submission of the Decree emphasized that it was intended to apply the general rule of *Alden–Rochelle* to all users of ASCAP music who could benefit from it, without suggesting any artificial limitation on the scope of the pertinent provisions.

Finally, in his oral statement to Judge Goddard in presenting the proposed amended Decree, the Department's counsel, Mr. Timberg, again emphasized the breadth of the sought-after relief. In his opening remarks, he noted the Department's investigation of "numerous complaints" since 1941 "from both the users of ASCAP music and authors and composers throughout the United States," and indicated that the proposed Decree was designed to deal with these complaints and the decisions of the courts in *Alden–Rochelle* and *Witmark v. Jensen.* (March 13, 1950 Tr. at 2, annexed to ASCAP Memorandum.)

In the course of describing the new provisions, Mr. Timberg noted that the proposed Decree, "so far as it bears on licenses for radio broadcasters, remains unchanged from its predecessors." (*Id.* at 8.) In contrast, however, he observed that the new Decree "does take account of new problems raised by the advent of television and the current legal controversy over motion picture performance rights." (*Id.*)

Mr. Timberg went on to describe Article V. After noting that the proposed Decree permitted ASCAP, "under carefully qualified and guarded limitations," to license motion picture producers "covering the subsequent performance of [their] music in motion picture films," he described the extension of this principle to other industries and its rationale:

> In like fashion, it is provided that the ASCAP music used in network telecasting be licensed at the source, that is, a single license to the originator of a telecasting program may cover the use of ASCAP music over all stations receiving the telecasted program. These provisions bring ASCAP's licensing activities in the motion pictures and television field into conformity with what the 1941 Decree provided with respect to radio broadcasting. Such licensing at the source is intended to avoid the harassment of suits against individual stations and individual motion picture exhibitors, such as was complained of in the *Alden–Rochelle* suit, and makes it possible for ASCAP to license the performing right at the same time that an ASCAP member grants recording or synchronization rights, along [the] lines suggested in Judge Leibell's opinion.

(*Id.* at 9.)

This analysis, which was fully endorsed by ASCAP's counsel (*id.* at 13), once more makes it evident that the intended reach of Article V was defined in functional terms, that is, to protect the ultimate users of ASCAP music who would otherwise be subjected to "the harassment of suits" if they failed to comply with ASCAP's fee demands. This inclusionary definition— based on a description of the harm sought to be avoided—again indicates that the term "telecasting network" is to be read in its functional sense, that is, to cover the supplying of programming by a packager to another entity for transmission, under the packager's name, to household televisions, and should not be limited based on either the particular technology used to transmit the programs into the homes of the ultimate audience or the particular financial arrangement existing between the packager and the local transmitter of the programs.

In short, the language of Article V is not self-evidently limited to over-the-air broadcasting, or to program suppliers whose financial arrangements with the ultimate transmitters of the programming mirrors that of the three major television networks extant in 1950. Moreover, the purpose of Article V, as evidenced by both the negotiating history of the Decree and the representations of the parties to the court at the time of its presentation, strongly indicates that Article V was intended to cover television generically—that is, all forms of television programming that is assembled by one entity and then distributed to a separate but affiliated entity for transmission, under the name of the program supplier, into the homes of a local audience. To construe this provision more narrowly, based on the state of technology in 1950 or financial characteristics not related to the underlying problem addressed by Article V, would appear to contravene both the intent of the parties and the public policies embodied in the Decree. Moreover, such an interpretation would ignore the obvious fact that the Decree was entered into at a time when the television industry was in its infancy, as noted in the Government's memorandum to Judge Liebell (Sokler Aff., Exh. C at 2) and hence could be expected to change in numerous ways, both technological and economic. The parties were of course aware of this fact and can scarcely be assumed to have intended their agreement to be so narrowly drawn as to be almost inevitably outmoded within the foreseeable future.[8]

---

8. As Mr. Timberg noted to Judge Goddard with respect to the provision for reexamination of the Decree after five years,

 [I]t really does not imply that the judgment which we are submitting is not the best that we have been able to work out at this time....

(March 13, 1950 Tr. at 10.) The inclusion of this provision is evidence of the parties' understanding that experience with the Decree or changes in the industry might in the future justify additional modifications to the Decree. (*See id.* at 10–11.) It does not suggest, however,

### b. *Other Considerations Supporting Applicants' Interpretation*

The applicants cite one additional body of evidence in support of their reading of Article V(A). As noted, ASCAP's decision in 1988 to refuse to provide licensing at the source for cable television was a new development; previously ASCAP had routinely issued licenses to the cable program suppliers that covered the performance of their programming by the cable system operators. (*See* Sokler Aff. at Exhs. B, G–J.) The applicants point to this prior history as an indication of the fact that ASCAP itself always knew that Article V(A) was applicable to cable television. *See, e.g., Board of Educ., Yonkers City School Dist. v. CNA Ins. Co.,* 839 F.2d 14, 18 (2d Cir.1988); *Ocean Transport Line, Inc. v. American Philippine Fiber Indus., Inc.,* 743 F.2d 85, 91 (2d Cir.1984); *Viacom Int'l Inc. v. Lorimar Productions, Inc.,* 486 F.Supp. 95, 98 n. 3 (S.D.N.Y.1980) (conduct of parties in performing contract before dispute arose is entitled to great weight in interpreting relevant contractual terms).

We must exercise some caution in weighing this evidence. As ASCAP notes, almost all of these license agreements contain a provision stating, in substance, that the license is experimental in nature and shall not be "binding upon or prejudicial to any position taken by either of the parties for any period subsequent to the termination of this agreement." (License Agreement between ASCAP and Showtime Entertainment for January 1, 1977 through December 31, 1979, at ¶ 1(C), attached to Sokler Aff. at Exh. G). (*See also* License Agreement between ASCAP and Home Box Office, Inc. for January 1, 1980 through December 31, 1982, at ¶ 1(C), attached to Sokler Aff. at Exh. H.) Nonetheless, this historical pattern is not entirely without weight.

First, it bears emphasis that ASCAP's issuance of such licenses was not a brief or isolated event, but rather covered a period of ten years. Second, none of the "without prejudice" provisions specifically targeted the "licensing at the source" term. Thus,

it is not entirely clear that ASCAP had that issue in mind when it added those provisions. Indeed, a contrary inference is suggested by the fact that in one instance the "without prejudice" provision was explicitly directed to the question of reasonable fee levels, and in another instance ASCAP did not even include a "without prejudice" provision in the license agreement. Thus, in its license with the Disney Channel for the period from April 18, 1983 through December 31, 1985, which included a "licensing at the source" provision (¶ 1(C)), ASCAP inserted a "without prejudice" provision stating only:

> This Agreement is being entered into on an experimental and non-precedential basis, and shall not be prejudicial to any position taken by either of the parties as to what is a reasonable license fee for the License Term or any period subsequent to the License Term.

(*See* Sokler Aff., Exh. I, at ¶ 1(D)). (*Compare* License between ASCAP and MTV Networks for January 1, 1986 through December 31, 1988, at ¶ 1(E), attached to Sokler Aff. at Exh. J). On another occasion ASCAP apparently entered into a license agreement with Univision, Inc. and Spanish International Communications Corporation for the period from November 1, 1987 through October 31, 1992, and included a "licensing at the source" clause (*see* Sokler Aff., Exh. B at ¶ 1(A)), but no "without prejudice" provision.

On balance, this evidentiary presentation does not clearly evidence ASCAP's understanding that Article V(A) applies to cable television, but it does offer some equivocal support for the applicants' reading of the Decree. Moreover, additional support may be found in deposition testimony of ASCAP's general counsel, Bernard Korman, Esq., taken March 7, 1986 in connection with the *Showtime* proceeding. At that time, when ASCAP was presumably not focussing on the possibility of limiting Article V(A) in the manner that it now presses, Mr. Korman seemed to read that provision as the applicants now do. Thus, in answering a question as to whether he viewed a

---

that they intended the Decree, as drafted, to

have a limited useful life.

license to the system operators as also covering the program suppliers, he responded:

> Well, I didn't mean to suggest—and I don't think my answer did suggest, that these were separate performances by the program suppliers. I consider that they are participating in a public performance and are therefore licensable.
>
> I think that it is really the choice of the industry as to how they wanted to be licensed. If the cable systems had said it is our preference that we obtain licenses for everything we do and we had issued such licenses, it is, at least theoretically, possible that those licenses would have covered everything that the program suppliers did so that no other license would have been necessary.
>
> Similarly, when a network says, or a so-called cable network says it wants a license which would run to the cable systems, if we issue such a license, as we have, then we would not expect to receive any money or to license the cable systems themselves with respect to those performances. So that when HBO takes a license, we don't expect any additional money from the cable system for the performances that HBO furnishes for that particular channel.

(Deposition of Bernard Korman, Esq., at 18–19, annexed to Sokler Aff. at Exh. A).

Again, this testimony, which does not speak directly to ASCAP's interpretation of Article V(A), is hardly dispositive of the case, although it may modestly strengthen the inference that ASCAP's issuance of licensing at the source to cable program suppliers over an extended period of time reflected its understanding that it was obligated to do so. On balance, the historical evidence cited by the applicants offers some modest support to their argument, although it is in no sense crucial to the court's reading of the Decree, which rests rather on the language used, the negotiating history, the context of the provision, and its evident purpose.

### c. *Distinctions Between Over–The–Air and Cable Television*

Bearing these general conclusions in mind, I turn now to ASCAP's specific arguments for the proposition that Article V(A) should not be read to apply to the applicants. As mentioned, they rest almost exclusively on distinctions between the methods of operation—both technological and financial—of the over-the-air networks and the cable program suppliers. In this regard, it bears noting that ASCAP's motion compares the applicants to the broadcast networks as they *currently* operate. This poses at least a theoretical anomaly, since the logic of ASCAP's argument should require a review of the broadcast networks' mode of operation in 1950, when the amended Decree was signed. Nonetheless, since this distinction does not affect the results of my analysis, I assume for present purposes that ABC, CBS and NBC operate in all material respects in the same way as they did more than 40 years ago.

In comparing the applicants with the traditional television networks, the parties are in general agreement as to the basic facts.[9] The cable program suppliers produce or acquire programming, package it under their own name, and in most cases transmit it by satellite to local system operators with which they are affiliated. The local operators in turn transmit the programming in unaltered form by cable to the televisions of subscribers in their designated locality. The programming of each program supplier is usually made available on a separate channel and is identified with the name of the supplier.

Some of the cable suppliers provide what is known as "basic" cable programming, which consists of programming that is made available to cable subscribers as part of the basic cable service provided by the cable system operator, and for which the subscriber need not pay a charge in addition to the standard monthly charge for cable service. Other cable suppliers provide so-called "premium" programming, for

---

**9.** The following description is derived principally from the affidavit of Ross Charap, submitted by ASCAP, and the affidavits of Terence F. McGuirk, Gregory Ricca, Brenda Fox and Judith McHale, submitted by the applicants.

which the subscriber must pay an additional monthly charge if he wishes to receive it.[10] In addition, some cable program suppliers operate on the basis of "pay per view," providing occasional programs featuring a special event such as a boxing match or major concert.

The program suppliers that provide basic programming receive most of their revenue from advertising on the programs. In addition, they receive a share of the subscribers' payments to the system operator for basic cable service. The program suppliers of premium programming receive their revenue solely from a share of the subscribers' payments to the systems operator for that programming.

The cable system operators typically provide a variety of services to their subscribers. By virtue of their control of the television cables, they supply a basic package that consists of the transmission of over-the-air channels with the enhanced visual quality obtained by the use of cable, together with a set of so-called basic cable channels, the programming for which they have obtained from one or more program suppliers. In addition, the system operators typically provide, for an additional fee, the programming of one or more program suppliers who originate premium programming. Again, these packages of premium programming will typically be provided on separate channels by the system operator. The system operators may also provide some local origination programming, which consists of programs prepared by or for the system operator at the local level, and not packaged by the cable program suppliers.

The over-the-air networks operate in a somewhat different fashion. Like the cable program suppliers, the networks have arrangements with locally-based entities that are equipped to transmit programming to the televisions located within their broadcasting area. Under their arrangements with their affiliated stations, the networks put together a package of programming under their own name which they provide by satellite to the local affiliated stations, and those stations in turn broadcast that programming over the air rather than by cable. The local station will typically identify itself and its programming as affiliated with the network supplying it with that programming.

The networks pay their affiliated stations to show their programming, and obtain their revenues from advertising run on their programming. Because of the difference in operating technology, the local over-the-air stations do not limit their transmissions to subscribers, as do the cable systems, and thus do not earn revenue by receiving subscription fees. Instead, local stations earn revenues from advertising received from local advertisers and payments made by the networks out of the network advertising revenues.

Unlike the cable system operators, which provide multiple channels for the programming that they provide their subscribers, the local over-the-air stations are limited to one channel. On that channel they will typically run both network-supplied programming and programming that the station itself has acquired, either by arranging for its production or by purchasing it from syndicators.

In terms of numbers, the cable suppliers and cable system operators differ somewhat from the over-the-air networks and their affiliated stations. There are approximately sixty cable program suppliers, and about 6,000 cable system operators. By contrast, there are only a handful of over-the-air networks, whether three—as contended by ASCAP—or a few more, as suggested by the applicants. As for local over-the-air stations, there are more than 1,000 nationwide. Of these, more than 600 are affiliated with or owned and operated by the three major networks. In addition there are about four hundred so-called independent stations, which are not affiliated with a network.

10. A few suppliers provide basic cable programming in some areas and premium programming in others.

From this congeries of similarities and dissimilarities between cable and over-the-air entities, ASCAP cites a host of differences, the collective weight of which, it asserts, demonstrates that cable program suppliers are not "telecasting networks" within the meaning of Article V(A). In citing these differences, ASCAP does not appear to suggest that any one of them demonstrates the inapplicability to cable television of the "licensing at the source" principle embodied in Article V(A). Rather, it simply argues that cable television is so different from over-the-air television in its technology and financial structure that it would stretch the bounds of reason to conclude that the authors of the 1950 Decree, had they foreseen the advent of cable television, would have understood that their agreement covered it. ASCAP's argument is unpersuasive.

I briefly review each of the cited differences. The most obvious technological difference is that the over-the-air networks' programming is initially transmitted by the affiliated stations by over-the-air signals rather than by cable. This distinction is plainly irrelevant to the concerns that Article V(A) was designed to address, and it hardly justifies artificially carving out a portion of the generic medium to which the amended Decree was addressed, based simply on the method by which the programming is transmitted from a broadcast facility to the televisions of people in the area served by the transmitting entity. This distinction is even less supportable when we recall that, at present, in large areas of the country most of the viewing audience of over-the-air network programming actually receives it via the very same cables that supply the programming prepared by the cable program suppliers. Finally, the irrelevance of this difference for purposes

of construing the intended scope of the Decree is underscored by hypothesizing a situation in which the over-the-air affiliated stations decided, for either technological or business reasons, to switch their method of transmission to cable rather than over-the-air signals.[11] In such an instance it can scarcely be suggested that the traditional networks, by virtue of this change, would cease to be "telecasting networks" under the Decree and hence would lose their entitlement to the protections of Article V(A).

The second technological distinction is that the cable system operators can provide simultaneous programming on numerous channels, whereas the over-the-air stations each provide programming only on one channel. Again, for purposes of Decree interpretation, this appears to be a distinction without a difference, since it is entirely irrelevant to the concerns that brought about the addition of Article V(A) to the Decree, and since it does not make cable television any less a part of what is generically the business of producing and transmitting television programming into the homes of a local audience.[12]

The remaining distinctions cited by ASCAP concern differences in the financial and operating relationships between the cable program suppliers and cable system operators, on the one hand, and the over-the-air networks and affiliated stations, on the other. Thus, for example, ASCAP notes that there are far more cable program suppliers than traditional networks. This is indisputably true, but plainly irrelevant as well. Moreover, it can scarcely be said that if more traditional networks opened for business in the next few years, they and their predecessors would, by virtue of that fact, cease to be considered

---

**11.** I of course assume for purposes of this hypothesis that the stations could obtain the appropriate governmental approvals.

**12.** It should be noted that ASCAP's technological differentiation might carry more weight if it were addressing, for example, the video cassette industry rather than cable television. Arguably the sale or rental of cassettes to members of the public who then bring the cassettes into their own homes and play them on a video-cassette

recorder and view them on their television or on a monitor is so different from the basic function of the television industry—to communicate programming from a transmitting facility into the homes of the television owners—that it would not be fairly covered by the wording of the Decree or the presumed understanding of its drafters. *Cf. Cohen v. Paramount Pictures, Corp.,* 845 F.2d 851, 853–854 (9th Cir.1988).

telecasting networks and no longer be covered by Article V(A) of the Decree.

ASCAP also notes that in most localities there are at least three or more competing local over-the-air stations, whereas typically there is only one cable system operator in a given locality, operating without competition. Again this argument carries no weight. First, it is irrelevant to the *raison d'etre* for Article V(A), and fails to suggest why cable television should be excepted from the protection of that provision, given the negotiators' obvious assumption that television as a generic medium was to be protected to the extent that licensing at the source was feasible. Second, it bears emphasis that there is no inevitability to the number of local over-the-air stations or to the number of cable system operators in a given locality. Thus, although many municipalities choose to license only one cable operator for any given geographic area, this is not always the case. *See, e.g., Warner Cable Communications, Inc. v. City of Niceville,* 911 F.2d 634, 635 (11th Cir. 1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991). *See also City of Los Angeles v. Preferred Communications, Inc.,* 476 U.S. 488, 493–94, 106 S.Ct. 2034, 2037, 90 L.Ed.2d 480 (1986). Third, even in localities where only one cable system operator is active, this does not speak to whether the system operator, in its capacity as a transmitter of unique programming, is without competition.[13] Obviously, the system operator in such a case is the only source of programming provided by cable program suppliers, but that programming is of course in direct competition with the programming provided by the over-the-air stations, including stations affiliated with the networks, stations owned and operated by the networks and independent stations. Indeed, there is

no question that cable and over-the-air television compete directly for audience, programming and advertising.[14] Fourth, it cannot seriously be suggested that if, in the future, the local television industry contracted to the point that many localities had only one network affiliate, the Decree might be interpreted to exclude the traditional networks from coverage under Article V(A). Similarly, ASCAP does not suggest that if more localities were to allow competition among cable system operators, this would render Article V(A) applicable to cable program suppliers.

ASCAP makes the related point that most local over-the-air stations are affiliated, if at all, with only one network, whereas the cable system operators typically arrange for programming from a number of cable program suppliers. This difference is attributable to the fact that the cable system operators have the technology to operate multiple channels simultaneously and hence can contract to transmit a variety of cable program suppliers' programming at once. Like the over-the-air networks, however, the programming of each cable supplier is typically transmitted on a separate channel and that programming is explicitly identified with the supplier. In any event, as noted, this technological distinction does not in any sense suggest a reasoned basis for interpreting Article V(A) as not intended to cover television networks generically.

ASCAP also points to the differences in the source of revenues for the over-the-air networks and their affiliated stations, on the one hand, and for the cable program suppliers and local system operators, on the other. As noted, the networks pay their affiliated stations to run their pro-

---

**13.** Insofar as the system operator is providing another form of service—that is, enhanced visual quality for all channels—it would be operating without competition, although subject to regulation both by the municipality and by the FCC. This function is, however, irrelevant to the present proceeding, which is examining solely the transmission of cable programming through the local system operators. In this respect the system operator performs a service analogous to that of the network affiliate.

**14.** The close similarity in programming and audience is also underscored by recent announcements of joint programming projects by cable program suppliers and over-the-air networks. *See* "ABC Agrees to Broadcast Cable Show," *N.Y. Times,* May 30, 1990, at D1; "MTV's 10th Birthday Show to be Broadcast on ABC," *N.Y. Times,* June 12, 1991, at C17.

gramming, and their revenues derive from advertising on that programming. The cable companies present a somewhat different practice in two respects. First, the cable program suppliers do not pay the system operators to run their programming. Second, the premium program suppliers receive their revenues exclusively from their share of the operators' subscriber fees, while the basic cable suppliers derive their revenues principally from advertising and to a lesser degree from subscriber fees paid to the system operators.

These differences quite obviously derive in significant measure from the technological differences between the over-the-air and cable transmissions. The over-the-air broadcasts are available to anyone with a television, whereas the cable programming requires a hook-up between the cable and the viewer's television. Not surprisingly, then, the cable systems "generally operate on the basis of a wholly different entrepreneurial principle." *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 700, 104 S.Ct. 2694, 2701, 81 L.Ed.2d 580 (1984).

The system operator's reliance on the acquisition of fee-paying subscribers, and its sharing of those fees with the originator of the programming, do not, however, demonstrate a difference between cable and over-the-air television that would justify the reading of Article V(A) that ASCAP now presses. As noted, the drafters of the Decree were seeking to apply the previously established principle of "licensing at the source" to all circumstances in which it might be relevant, and they included television as an emerging medium of mass communication that relied in part on separate entities to package and broadcast programming. There is no reason to believe that, when including television within the

coverage of Article V(A), the drafters placed any weight or significance on the source of the revenues of either the networks or their affiliated stations. What mattered was that the networks controlled the assembling of a significant body of programming and transmitted it to a separate entity—the local station—for rebroadcast. Given that relationship, the drafters recognized the beneficial potential of a "licensing at the source" requirement, and their reasoning applies irrespective of whether the program supplier obtains its revenues from advertising on its programs or from moneys paid it by the broadcaster, and irrespective of whether the broadcaster obtains its revenues from advertising or from subscribers or from the program supplier.[15]

ASCAP also relies on perceived differences in the ownership of cable program suppliers and cable system operators, on the one hand, and over-the-air networks and affiliated local stations, on the other. Thus ASCAP notes that no local over-the-air stations own a majority of shares of any of the networks, and that each network is prohibited by FCC regulations from owning and operating more than five stations each, and may not own production companies that supply it with programming. By contrast, in the cable industry, ASCAP notes, there is far more concentrated ownership, with a number of so-called multi-system operators (MSO'S) owning a large number of local system operators,[16] and several large MSO's also owning or controlling some of the largest cable program suppliers.

ASCAP does not suggest that these differences in pattern of ownership have any independent significance in construing the

**15.** If, by chance, the over-the-air networks were to change their contractual relations with their local stations in such a manner as to leave all advertising revenue in the first instance to the local stations and require the stations to pay a portion of these revenues to the networks, this revenue flow would far more closely resemble that found in cable television. Such a change, however, would hardly disentitle the networks to the protection of Article V(A). Similarly, if as a result of technological innovation the over-

the-air stations could scramble their signals and require viewers to subscribe to their services, this too would not deprive the networks of the protection of Article V(A).

**16.** According to ASCAP, the fifteen largest MSO's own 60 percent of all local system operators and the fifty largest own nearly 82 percent. Affidavit of Ross Charap, sworn to May 19, 1989, at ¶ 20.

scope of Article V(A),[17] nor could it reasonably do so. The fact that many system operators are owned by the same company or that that company or its parent also owns a cable program supplier does not alter the fact that cable television is reasonably understood to be television within the meaning of the 1950 Decree,[18] and that there is no reason to assume that in applying Article V(A) to "telecasting networks", the drafters were concerned with who owned the networks or the local affiliated stations, or with the degree of concentration of such ownership. Indeed, the television industry in 1950 was in its infancy, and it can scarcely be expected that the negotiators had in mind the precise financial arrangements of the television industry that would evolve under the aegis of either Congress or the FCC.

ASCAP further seeks to distinguish cable and over-the-air program suppliers by noting that the cable suppliers do not distribute their programs exclusively through local system operators. Although this is their principal means of transmission, the program suppliers also utilize some other means, including master antenna television, multi-point distribution systems, satellite master antenna television, backyard satellite dishes and even some local over-the-air television stations. This variety is not surprising in view of technological developments, but it also does not alter the fact that, in their relationship with the local system operators—which is the only relationship currently at issue in this proceeding—the program suppliers play the same role as the networks in distributing programming to local cablecasters for transmission under their name to a local television audience. It is this division of function that led the drafters of the 1950 Decree to apply the "licensing at the source" requirement to television, and hence there

is good reason to infer that this licensing principle applies to the relationship between the cable program supplier and the local system operator as well.

In a related argument, ASCAP notes that the local system operators also perform more functions than simply transmitting the programs received from the cable program suppliers. Thus, they transmit both local and distant over-the-air stations via cable, and in some markets also provide radio station signals and home security and alarm services. Again, this argument is of little consequence. The over-the-air affiliated stations also do not function exclusively to transmit programming from their respective networks. In addition to that service, they provide both syndicated programming and locally produced programming. Thus, the fact that the local system operators do more than simply transmit cable programming from their suppliers does not distinguish them from over-the-air local stations.

More importantly, the purported distinction is entirely irrelevant. As repeatedly noted, the issue addressed by Article V(A) is whether ASCAP may require not only the network but also the local affiliated station to obtain a license in order to broadcast network programming. Therefore, the only pertinent activity of the local telecaster is its transmission of programming received from the program supplier for broadcast. In this respect, the local affiliated over-the-air stations and the system operators play the same role. Additionally, it should again be emphasized that the drafters of Article V(A) can scarcely be charged with knowledge of, much less reliance upon, the scope of services ultimately provided by television broadcasting companies in addition to those foreseen at the time of the Decree. Indeed, were the local

---

**17.** Perhaps an argument could be constructed to the effect that the greater degree of concentrated ownership of system operators might place them in a somewhat stronger bargaining position vis-a-vis ASCAP than their over-the-air counterparts if they were compelled to negotiate a separate license fee for cable programming. This seems a doubtful proposition, however, in view of the degree of industry-wide cooperation among the thousand-plus local television sta-

tions, virtually all of which are represented by the All–Industry Committee. In any event, these developments were obviously not foreseeable by the drafters of the 1950 Decree.

**18.** I note that a number of local over-the-air television stations are also controlled by companies that own more than one station.

over-the-air stations in the future to enter such areas of endeavor as apartment security or other unrelated businesses in addition to their prime function of telecasting, we would scarcely conclude that this development deprives the networks of their protection under Article V(A).

Finally, ASCAP notes that local over-the-air telecasters must obtain a license from the FCC in order to operate, whereas the local system operators are licensed locally. This is true but once again irrelevant. Congress has chosen for a variety of reasons to impose on cable television a somewhat different regulatory regime than exists with respect to over-the-air television. Thus, in the Cable Communications Policy Act of 1984, 47 U.S.C. § 521 *et seq.*, Congress authorized state and local authorities to enfranchise cable systems and to establish regulations governing the type of equipment that the franchisees may use, but at the same time the law reserved to the FCC broad authority over the manner in which local governments exercise their licensing authority [19] and over technical standards. *See generally City of New York v. FCC*, 486 U.S. 57, 65–67, 108 S.Ct. 1637, 1642–44, 100 L.Ed.2d 48 (1988). This hardly speaks, however, to the proper scope of Article V(A). Indeed, if Congress had chosen in 1984 to give the FCC the authority to license the cable system operators or if next year it chose to remove licensing authority over local television stations from the FCC and give it to the states or to municipal authorities, this would not in any way alter our reading of the 1950 Decree.

In sum, none of ASCAP's proffered distinctions between over-the-air television and cable television individually justifies reading Article V(A) as narrowly as ASCAP suggests. Moreover, the collective weight of those distinctions equally fails to suggest that the cable television program suppliers should be viewed as outside the coverage of Article V(A). As noted, none of the differences cited by ASCAP reflects on the rationale for requiring "licensing at

the source" in television, nor do any of the cited unique characteristics of over-the-air television appear to have guided the approach of the negotiators in drafting Article V(A). Thus, the collective weight of a number of irrelevant distinctions should not be any greater than the weight of any single one.

In substance, ASCAP argues that a sufficient number of distinctions, even if otherwise irrelevant, should lead to the conclusion that cable television is so different from over-the-air television as not to be "television" within the meaning of the Decree and the understanding of its drafters. Although modern science and industry might well develop a medium of mass communication that resembled television broadcasting and yet could not fairly be so characterized—arguably, for example, the video-cassette industry [20]—that is simply not the case with cable television. Moreover, ASCAP's method of seeking to distinguish cable television would lead us to a virtually inarticulable standard for interpreting the Decree. ASCAP's approach begs numerous questions. For example, how many otherwise irrelevant distinctions suffice to separate protected television broadcasting from unprotected television broadcasting? How are we to treat distinctions that are created by recent changes in technological or financial conditions? Of what relevance to interpreting a forty-year-old decree are future changes in the television industry? Will the *over-the-air* television networks themselves be in danger of losing their status as telecasting networks if they make sufficient changes, either technological or financial, in their manner of operation or if Congress or the FCC significantly changes governing regulatory policies? To raise these questions suggests the unclarity of the analytical tool that ASCAP seeks to wield on this motion. *Cf. McCarthy v. Bronson*, — U.S. —, 111 S.Ct. 1737, 1742, 114 L.Ed.2d 194 (1991) (citing simplicity as additional reason for its reading of Magistrates Act). Since the alternative interpretation suggested by the applicants

**19.** *See* 47 U.S.C. §§ 541, 542 (1991).

**20.** *See supra* at note 12.

better serves the underlying purpose of Article V(A) and since the analysis on which that reading rests is more cogent and readily applicable, I conclude that AS-CAP's analysis cannot be accepted.

### d. The Views of the Department of Justice

There remain for consideration the expressed views of the Department of Justice, which was invited by the court to brief the issue of whether Article V(A) should apply to the applicants. In assessing the position of the Department, I note that its interpretation is to be given serious attention both because it is principally responsible for executive enforcement of the antitrust laws and because the Government was a signatory, along with ASCAP, to the Decree. Nonetheless, the views of the Antitrust Division, even if they coincide with those of ASCAP, are not necessarily dispositive.

It bears emphasis that a consent decree is not merely a contract, but also a court judgment, which the court approves only after reviewing it and determining that it sufficiently serves the public interest embodied in the statute under which it is entered. *See, e.g., United States v. American Cyanamid Co.,* 719 F.2d at 563–64. *See also In re International Business Machines Corp.,* 687 F.2d 591, 600 (2d Cir. 1982) (discussing the Tunney Act, 15 U.S.C. § 16(b)). Thus, as noted, in interpreting an ambiguous consent decree, the court is exercising an equitable power that is to be used in the service of the public policies that underlie the decree itself. *United States v. American Cyanamid Co.,* 719 F.2d at 564. It also should be emphasized that in this case the Department of Justice does not purport to offer the views of its own negotiators of the Decree. Indeed, although both attorneys who were principally involved in the drafting of the Decree—Mr. Timberg for the Department, and Herman Finkelstein, Esq. for AS-CAP—were at some point deposed on related issues in an earlier proceeding, none of

the parties to this proceeding offer any testimony by them that is directly addressed to the issue at hand.[21] Since "[t]he relevant 'understanding' is the one that the parties held 'contemporaneously' with the decree's formation," *United States v. Western Elec. Co.,* 894 F.2d at 1393 (citing *United States v. Western Elec. Co.,* 846 F.2d 1422, 1427 (D.C.Cir.), *cert. denied* 488 U.S. 924, 109 S.Ct. 306, 102 L.Ed.2d 325 (1988)), it follows that the Department's analysis cannot be said to speak definitively as to the meaning of the disputed provision. *Cf. United States v. Loew's Inc.,* 882 F.2d 29, 33–34 (2d Cir.1989) (approving district court's searching review of agreed-upon reading of decree by Government and defendant).

Bearing these considerations in mind, I address the analysis proffered by the Department of Justice. The Department's stated views generally accord in all respects but one with the applicants' analysis; that one difference, however, leads the Department to conclude that Article V(A) should not be read to cover the applicants.

In substance, the Department opines that application of Article V(A) to the cable program suppliers would further the policies underlying the Decree and, particularly, the goals sought by the inclusion of that article in the Decree. It also agrees that if the negotiators of the 1950 Decree had been able to foresee the development of cable television, the Department would have sought to include it within the scope of Article V, although it observes that the likely reaction of ASCAP in this hypothetical situation is unknowable. The Department also notes that although neither party in 1950 negotiated in direct contemplation of cable television, this is not dispositive in assessing the scope of Article V(A). Rather, one must determine whether the language used in the Decree is sufficiently broad or flexible to cover this new form of television. In this regard, the Department further opines that, in assessing the scope

---

**21.** The only testimony offered of the principal negotiators of the Decree is a brief excerpt from the deposition of Mr. Timberg taken in the *Buffalo Broadcasting* proceeding, which is of no obvious relevance to the issue before the court. (*See* ASCAP Reply Memorandum at 11 n. 1 & Exh. 1.)

of Article V(A), differences in technology between over-the-air and cable television should not be dispositive, since the inevitability of future technological change was foreseeable at the time that the Decree was signed. Thus, the court should look to the language used, the degree of similarity of operations between traditional and newer forms of television, and the explanations for the provision at issue that were offered when the Decree was approved.

In comparing over-the-air and cable networks, the Department notes both "strong operational and economically significant similarities" and "important differences." (Memorandum for the United States at 8.) Among the similarities that it cites is the function played by the cable programming suppliers, which produce or acquire programming for distribution to cable systems under contractual affiliation for retransmission to viewers. The Department also notes that the cable systems are paid for their retransmission of these programs, whether through advertising or subscription fees. Finally it notes, and the record demonstrates, that the cable program suppliers compete with the over-the-air networks for programming, audience and advertising revenues. As for the differences, the Department notes (1) that there are only three "major television networks" as compared with at least sixty cable program suppliers competing for access to local system operators, (2) that the over-the-air networks' use of music in their programming is "essentially homogeneous" whereas the cable services vary in the extent of their use of music, and (3) that basic cable program suppliers derive most of their revenue from advertising, as do the over-the-air networks, whereas the premium services rely on a portion of subscriber fees paid to the cable system operators.

The Department does not purport to suggest that the distinctions it cites are directly relevant to the question of whether Article V(A) should be read to apply to cable programming services—indeed, they appear quite irrelevant—and in any event it arrives at the tentative conclusion "that cable services could be treated as 'telecasting networks' under Article V(A) without impermissibly straining the Decree's language." (Id. at 9.) Thus, until the last step of its analysis, the Department appears to support the conclusions pressed by the applicants.

The basis for the Department's contrary final conclusion is its view that the cable system operators cannot be equated to "affiliated stations" as that term is used in Article V(A). The sole explanation for this assertion is found in the following passage in the Department's brief:

> We think, however, that when cable systems are equated to "affiliated stations," the language is stretched too far. A "station," in the context of Article V(A)'s reference to broadcasting and telecasting, would commonly be understood—we think—to describe an over-the-air local transmitting facility, broadcasting a single program at a time and competing with transmissions by other local stations serving the same customers. These characteristics are very different from those of a local cable system which broadcasts many programs simultaneously (including those of local over-the-air stations) over its available channels.

(Id.) (footnote omitted). The balance of the Department's discussion of the issue is limited to explaining the policy reasons for requiring "licensing at the source" in television generally.

Giving the Department's stated views careful consideration and such deference as is due, I nonetheless cannot agree with the last step in its analysis. There are several problems with its argument.

The first problem is that it appears inconsistent with the Department's suggestion that the applicants may permissibly be viewed as within the intendment of the term "telecasting network." Even as an abstract definitional exercise, the determination of whether the program suppliers constitute such networks necessarily depends upon the role that they play, and that role is defined in significant part by

their relationship to the system operators.[22] If the system operators are so dissimilar from over-the-air local stations as not to be considered "affiliated stations" under Article V(A), it is difficult to understand how the cable program suppliers can be deemed to be "telecasting networks" within the meaning of the Decree. By the same token, if cable program suppliers can fairly be so characterized, it is equally difficult to understand how the cable system operators can be deemed not to be affiliated stations.

The second problem with the Department's analysis is that it appears inconsistent with its prior assertion that technological differences between cable and over-the-air television should not be dispositive. The distinctions relied upon by the Department all either concern or flow from the fact that the system operators have the technological capacity to use cable to transmit television programs, and hence they can obtain revenue not only from advertising but also from subscription fees, and can telecast on multiple channels simultaneously.

The third problem with the Department's analysis is that the distinctions it draws between the system operators and local over-the-air stations have no relevance to the policy embodied in Article V(A)—indeed the Department appears to concede this point—and its conclusion ignores the relevant drafting history and the stated intentions and purposes of the drafters. As noted, the evidentiary record reflects the drafters' intention to apply the "licensing at the source" principle to all relevant industrial circumstances, and that included the emerging medium of television. Under the circumstances, the most reasonable reading of the term "telecasting network" and the companion term "affiliated station" would encompass the television industry generically, and would not be limited to television broadcasting that utilizes the

same basic technology or involves the same financial relationships as existed in 1949 or 1950. Since the relevant functional relationship of the cable program suppliers to the system operators is the same as the relationship between the over-the-air networks and their affiliated stations, the fact that the system operators can each transmit programs simultaneously on multiple channels or receive money from subscription fees should not justify their exclusion from the reach of Article V(A).

The fourth problem with the Department's interpretation is that it apparently relies on nothing more than counsel's intuitive assumption as to what is the commonly understood meaning—if one exists—of the term "stations." As is evident from our discussion of the standards that govern the interpretation of ambiguous terms of a decree, this is too narrow an approach. In addition, even if this were in theory a defensible means of determining the meaning of the term, it would fail in this instance because counsel's conclusion does not rest on any body of objective data. As noted, the Department mentions none, and indeed appears to suggest by its interjected phrase "we believe", that it is merely speculating on the matter.

Moreover, if common public understanding of the term "station" were the dispositive issue, we could readily conclude that in fact cable system operators do qualify. For example, *Webster's New Collegiate Dictionary* defines the term "station," *inter alia*, as either "a complete assemblage of radio or television equipment for transmitting or receiving" or "the place in which such a station is located." *Id.* at 1136. Similarly, *The American Heritage Dictionary* defines "station" as "[a]n establishment equipped for radio or television transmission" and "[a]n input or output point along a communications system." *Id.*

---

**22.** For example, *Webster's New Collegiate Dictionary* (1977) defines "network" in pertinent part as:

> **4a:** a group of radio or televisions stations linked by wire or radio relay **b:** a radio or television company that produces programs for broadcast over such a network[.]

*Id.* at 771. The *American Heritage Dictionary* (2d ed. 1982) gives this relevant definition: "3. A chain of interconnected radio or television broadcasting stations, usually sharing a large proportion of their programs." *Id.* at 838. This dictionary in turn defines "Broadcasting" as the "transmission" of radio or television programming. *Id.* at 210.

at 1190. Under either definition, it appears that the system operators would qualify. Furthermore, as TBS notes in its memorandum, the courts frequently refer to system operators as "stations" or "cable stations." *See, e.g., Cottle v. Storer Communication, Inc.,* 849 F.2d 570, 573 (11th Cir.1988); *Hubbard Broadcasting, Inc. v. Southern Satellite Systems, Inc.,* 777 F.2d 393, 399 (8th Cir.1985), *cert. denied,* 479 U.S. 1005, 107 S.Ct. 643, 93 L.Ed.2d 699 (1986); *Cleveland Television Corp. v. F.C.C.,* 732 F.2d 962, 968 (D.C.Cir.1984); *Quincy Cable TV, Inc. v. F.C.C.,* 730 F.2d 1549, 1550 (D.C.Cir. 1984); *Crimpers Promotions, Inc. v. Home Box Office, Inc.,* 724 F.2d 290 (2d Cir.1983), *cert. denied,* 467 U.S. 1252, 104 S.Ct. 3536, 82 L.Ed.2d 841 (1984); *Christian Broadcasting Network, Inc. v. Copyright Royalty Tribunal,* 720 F.2d 1295, 1309 (D.C.Cir.1983); *Committee for Open Media v. F.C.C.,* 533 F.2d 1 (D.C.Cir.1976). Although ASCAP is correct in noting that these decisions did not focus on any definitional issues, that is beside the point; to the extent that the Department's analysis appears to turn on its assumption as to common usage of the term "stations," it is appropriate to look to the terminology utilized, in however casual a fashion, by the courts.

In assessing this semantic question, I note one possible argument that could be advanced in support of ASCAP's position. In common parlance the term "television station" is often used interchangeably with the term "channel." Arguably this might provide a distinction between over-the-air and cable television broadcasters since the cable operators control multiple channels. Ultimately, though, this argument is unconvincing for several reasons. First, as noted, the ability of system operators to control multiple channels does not impact in any way on the rationale for applying the "licensing at the source" principle to cable television, and it does not make cable television any less a constituent part of "television" as a generic mass communications medium. Second, Article V(A) of the Decree, in referring to "affiliated stations," was presumably referring to the companies that operate the actual broadcast facilities

that in turn broadcast programs. Indeed, when ASCAP enters into a license to cover local over-the-air telecasting, its license is with the company, not the "channel." Whether the company owns or controls only one channel or more than one is seemingly of no consequence under the Decree—indeed some companies control more than one over-the-air station—and hence this purported distinction between cable and over-the-air broadcasting falls of its own weight.

In sum, neither ASCAP's arguments nor the analysis of the Department of Justice persuasively explains why the protection of Article V(A) should be limited to over-the-air television networks and thus denied to cable program suppliers insofar as those companies play the same functional role as the traditional networks. Necessarily, then, ASCAP's motion for summary judgment must be denied.

### e. *Should Judgment Be Entered for the Applicants?*

█ There remains the procedural question of whether, at this juncture, judgment may be entered in favor of the applicants on this issue. This question is posed because (1) applicants did not themselves move for summary judgment and (2) the court has found the relevant terms of the Decree to be ambiguous. In fact, however, neither of these considerations poses an obstacle to entry of judgment at this time.

█ With respect to the failure of the applicants to move for summary judgment, I note that when one side has moved under Rule 56, the court has discretion in appropriate cases to enter summary judgment against the moving party. *See, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 326, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986); *Coach Leatherware Co. v. AnnTaylor, Inc.,* 933 F.2d 162, 167 (2d Cir.1991). Indeed, in limited cases the court may even enter summary judgment *sua sponte* without prior notice. *See, e.g., id.* at 167; *Abrams v. Occidental Petroleum Corp.,* 450 F.2d 157, 165–66 (2d Cir.1971), *aff'd,* 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973); *Local 33, Int'l Hod Carriers Bldg.*

*& Common Laborers Union v. Mason Tenders Dist. Council of Greater New York,* 291 F.2d 496, 501 (2d Cir.1961). In any event, ASCAP had adequate notice, since not only did applicants in their submissions request entry of judgment in their favor, but the court at oral argument inquired of ASCAP's counsel whether there would be a need for an evidentiary hearing in the event that the court rejected ASCAP's argument that the Decree unambiguously excluded the applicants and instead found the Decree to be ambiguous. Counsel responded that no such hearing would be necessary since the record was complete and he could think of nothing that could be added. (Sept. 18, 1989 Tr. at 62–63.)

██ As for the second potential obstacle to entry of judgment for the applicants, I note that the Second Circuit has often observed that summary judgment in a contract case is appropriate if the relevant contractual terms are unambiguous, but not if the terms are ambiguous. *See, e.g., New York News Inc. v. Newspaper Guild of New York,* 927 F.2d 82, 84 (2d Cir.1991) (affirming summary judgment because contract was "not susceptible of competing interpretations."); *Cable Science Corp. v. Rochdale Village Inc.,* 920 F.2d 147, 151 (2d Cir.1990); *American Home Assur. Co. v. Baltimore Gas & Elect. Co.,* 845 F.2d 48, 50–51 (2d Cir.1988). Notwithstanding those general statements, there are circumstances in which summary judgment may be granted even if the contractual language is ambiguous. Such ambiguity requires the factfinder to examine evidence external to the language of the agreement in order to discern the parties' intent in entering into the contract. *See, e.g., Crescent Oil & Shipping Services, Ltd. v. Phibro Energy, Inc.,* 929 F.2d 49, 52 (2d Cir.1991); *United States Naval Institute v. Charter Communications, Inc.,* 875 F.2d 1044, 1048 (2d Cir.1989). In doing so, if there is no genuine dispute as to the material facts relevant to the discernment of the drafters' intentions—even if the evidence is extrinsic to the contract itself—the court may interpret the contract as a matter of law, based on those undisputed facts, and hence summary judgment may be appropriate. *See, e.g., Crescent Oil & Shipping Services, Ltd. v. Phibro Energy, Inc.,* 929 F.2d at 52–54 (affirming summary judgment even though contract was ambiguous, since plaintiff's extrinsic evidence did not create triable disputes as to material facts); *Burger King Corp. v. Horn & Hardart Co.,* 893 F.2d at 528; *Schering Corp. v. Home Ins. Co.,* 712 F.2d at 9; *National Union Fire Ins. Co. v. Argonaut Ins. Co.,* 701 F.2d 95, 97 (9th Cir.1983); *Sutton v. East River Savings Bank,* 55 N.Y.2d 550, 554, 450 N.Y.S.2d 460, 462–63, 435 N.E.2d 1075, 1077 (1982). *See generally Antilles S.S. Co. v. Members of American Hull Ins. Syndicate,* 733 F.2d 195, 203–07 (2d Cir.1984) (Newman, J., concurring) (suggesting that determination of meaning of contract that is either unambiguous or not illumined by extrinsic evidence is question of law).

In this case, the entire negotiating history of the Decree, insofar as it is relevant, and all the other pertinent extrinsic evidence reflecting on the intentions of the parties are now part of the record. From that record it is apparent that there are no disputed issues concerning the material evidentiary facts, although the parties of course disagree strongly as to the inferences to be drawn from those facts. Under these circumstances, as ASCAP's counsel agreed, there is no need to conduct a trial.[23]

Based on the evidence of record, I conclude that applicants are "telecasting networks" within the meaning of Article V(A) of the Decree. They are therefore entitled to a license that would cover the performance of their programming by cable system operators with which they are affiliated.[24]

---

**23.** It appears in any event that the negotiators for the parties are no longer available except as embodied in prior deposition testimony, and the parties have submitted only one snippet of marginally relevant testimony from those individuals.

**24.** In view of this disposition, there is no need to address applicants' alternative arguments based on the non-discrimination provision of Article IV or the wording of Article IX(A).

## C. *The Per–Program License Claim*

■ The second controversy submitted by the parties for decision concerns the provisions of Article VII(B) of the 1950 Decree, which requires ASCAP "to issue to any unlicensed radio or television broadcaster, upon written request, per program licenses, . . . ." The applicants contend that they are "television broadcasters" and hence are entitled to the issuance of a per-program license on reasonable terms. AS-CAP has resisted this demand, asserting that this term covers only over-the-air television, and hence that the cable program suppliers, as well as the cable system operators, are limited to a blanket license under the Decree, unless ASCAP voluntarily chooses to offer them an alternative form of licensing.

This issue was first raised at the conclusion of the trial in the *Showtime* proceeding. Ultimately, the parties there agreed to withdraw the matter from consideration in that case, and to address it fully in this proceeding by expanding the scope of AS-CAP's then-pending motion for summary judgment. Accordingly, the court invited all applicants to file papers "directed to the question of their entitlement to a per-program license." (Order dated Dec. 20, 1989.) The court also authorized discovery in connection with this question (*id.*), an invitation that none of the parties pursued. Briefing was received from ASCAP and the applicants, all of whom rely almost entirely on the record created in connection with ASCAP's original motion. In addition, by invitation of the court, the Department of Justice has submitted its views on the proper interpretation of Article VII(B).

In pressing its argument that cable television is not within the scope of Article VII(B), ASCAP once again urges this court to view the disputed language as unambiguously limited to over-the-air television broadcasters, and therefore not to look to any of the interpretive aids available to a court in construing ambiguous decrees. Somewhat inconsistently, ASCAP rests this argument principally on the assumption that the drafters of the Decree were relying on the definition of "broadcasting" in the Communications Act of 1934, 47 U.S.C. § 153(*o* ).[25] Again, its argument is unconvincing.

The term "television broadcaster" is not defined in the Decree. Although, as argued by ASCAP, it could be read as having a precise technological meaning that is limited to over-the-air transmissions, *see* 47 U.S.C. §§ 153(a), (b), and (*o* ) (defining broadcasting in terms of "radio communications" as distinct from "wire communications"), it may also fairly be read more broadly.

In common parlance the term is understood to encompass any transmitter of television programs. Thus, for example, *Webster's New Collegiate Dictionary* defines the word "broadcast" as "the act of transmitting sound or images by radio or television," *id.* at 140, while *The American Heritage Dictionary* defines the term as "[t]o transmit a radio or television program." *Id.* at 210. Moreover, a number of court decisions have used the term "broadcast" to refer to cable television. *See, e.g., Jimmy Swaggart Industries v. Board of Equalization of California,* 493 U.S. 378, 110 S.Ct. 688, 692, 107 L.Ed.2d 796 (1990); *United States Football League v. National Football League,* 842 F.2d 1335, 1362 (2d Cir.1988) (referring to the sale of broadcasting rights to cable television). Furthermore, the ambiguity of the term as used in the Decree is underscored by reading Article VII in its entirety, since it makes plain that the drafters used "television broadcaster" interchangeably with "telecaster." Thus, the introductory clause to Article VII provides that "Defendant ASCAP, in licensing rights for public performance for radio broadcasting and telecasting . . . ." Similarly, Article VII(B), in specifying how the per-program license may be priced, provides that the fee may be "based upon the payment of a percentage of the sum paid by the sponsor of such

---

**25.** The anomaly in ASCAP's argument is that the 1934 Communications Act constitutes an extrinsic aid to interpretation, and should therefore not be consulted if the Decree is unambiguous on its face.

program for the use of the broadcasting or telecasting facilities of such radio or television broadcaster." Article VII(A) also refers to "the radio broadcaster or telecaster." *See also* Decree Art. V(A) (referring to "radio broadcasting network" and "telecasting network"). Indeed, ASCAP's own counsel, in his memorandum of explanation to Judge Leibell in March 1950, described the obligation of ASCAP to offer per-program licenses as running to "telecasters." (*See* ASCAP memorandum at 8, attached to Sokler Aff. as Exh. E.)

The term "telecaster" is, if anything, broader in scope than "broadcaster" since it is divorced from any possible implication, based on the 1934 Communications Act, 47 U.S.C. § 153(*o*), that the transmission must be by radio communication. Indeed, the Television Program Improvement Act of 1990 defines the term "telecast" to mean— "(A) to broadcast by a television broadcast station; or (B) to transmit by a cable television system or a satellite television distribution service." 47 U.S.C. § 303c(b)(3).

In short, the disputed term is susceptible to more than one reasonable interpretation. Necessarily, then, the court may look to extrinsic aids to construction.[26] I therefore turn first to the historical context of Article VII.

The per-program license differs from the more commonly utilized blanket license in that the licensee pays a fee only for designated programs. In contrast, under the blanket license the licensee is required to pay for a license that covers all programs, irrespective of the fact that some of those programs may have no uncleared music. The per-program license therefore has several potential advantages for a telecaster. If he carries a significant number of programs without music or with music that he has cleared either directly with the composer or through a syndicator or through a performing rights society other than AS-CAP, a per-program license is likely to save him money if it is priced appropriately in relation to the blanket license. Moreover,

the availability of a per-program license gives the telecaster an incentive to seek so-called source or direct licensing since such licensing would reduce the expense of his ASCAP license. *See ASCAP v. Showtime/The Movie Channel,* 912 F.2d at 570. In short, the per-program license serves as a counterbalance to ASCAP's market power, which is most clearly exercised by its preference for the blanket license.

The 1941 complaint of the Justice Department focussed on ASCAP's alleged exercise of monopoly power based on its pooling of its members' copyrights and its insistence on the use of the blanket license as a means of maximizing its revenues from music users. Not surprisingly, in view of the potential advantages of the per-program license to music users in appropriate situations, the drafters of the 1941 Decree required ASCAP to make such a license available for radio broadcasters. Thus, Article II(3) of the Decree provided:

With respect to any existing or future performing license agreement with a radio broadcaster, defendant, American Society of Composers, Authors and Publishers, shall not, if required by such broadcaster, refuse to offer a per program basis of compensation on either or both of the following bas[e]s which may be specified by the broadcaster:

(i) in respect of sustaining programs a per program license fee expressed in terms of dollars, requiring the payment of a stipulated amount for each program in which musical compositions licensed by said defendant shall be performed;

(ii) in respect of commercial programs, a per program license fee, either expressed in terms of dollars, requiring the payment of a stipulated amount for each program in which the musical compositions licensed by said defendant for performance shall be performed, or, at the option of defendant, the payment of a percentage of the revenue derived by the licensee for

---

**26.** Indeed, as noted, ASCAP relies heavily on such aids, principally the definition of the term "broadcasting" in the Communications Act of

1934, 47 U.S.C. § 153(*o*), and subsequent court decisions interpreting that provision.

the use of its broadcasting facilities in connection with such program.

The Decree explicitly stated that this provision was intended "to afford radio broadcasters alternative base[e]s of license compensation." *Id.*, Art. 3. In other words, the drafters designed a regime that would permit radio broadcasters to avoid the blanket license. This point is underscored by two additional requirements of the 1941 Decree. Earlier in Article 3, ASCAP was prohibited from requiring radio broadcasters to pay:

a license fee of which any part shall be (a) in respect of commercial programs, based upon a percentage of the income received by the broadcaster for programs in which no musical composition or compositions licensed by said defendant for performance shall be performed, or (b) in respect of sustaining programs, an amount which does not vary in proportion either to actual performances, during the term of the license, of the musical compositions licensed by said defendant for performance, or to the number of programs on which such compositions or any of them shall be performed ...

In short, ASCAP could not insist on the use of a blanket license or its equivalent as a condition for licensing; the blanket license was permitted only "if desired by such broadcaster...." (*Id.*) In addition, after requiring ASCAP to issue per-program licenses on request, the 1941 Decree required the Society, if it offered a blanket license as an alternative to the per-program license, to "act in good faith so that there shall be a relationship between such per program basis and such other basis, justifiable by applicable business factors, including availability, so that there will be no frustration of the purpose of this subparagraph to afford radio broadcasters alternative bas[e]s of license compensation." (*Id.*) In sum, ASCAP could not effectively deny radio broadcasters the per-program license by pricing it too high in comparison to other forms of licenses.

There is no suggestion that the radio industry used the per-program form of license to any significant extent during the 1940's, quite possibly because radio broadcasting in that era was a fairly spontaneous affair and hence the broadcaster would not know in advance which programs would need ASCAP licensing. Nonetheless, the negotiators of the 1950 amended Decree not only retained the old requirement that such licenses be offered on demand, and applied that requirement to television, but in fact further limited ASCAP's ability to avoid making such a license available. Moreover, these changes do not appear to have been a source of controversy between the negotiators.

In May 1949 an internal Justice Department memorandum suggested adding television to the original provision requiring the issuance of per-program licenses. (*See* memorandum dated May 19, 1949 from W.D. Kilgore, Jr. to Sigmund Timberg at 1–2, attached to USA Memorandum as Exh. J.) By early July 1949, a meeting of the negotiators confirmed that both sides agreed that "[r]adio and television [were] to be treated alike for purposes of [the] decree." (Memorandum dated July 6, 1949 at 3, attached to USA Network Memorandum as Exh. E), thus indicating that the prior per-program license requirements would be applied to television. The balance of the negotiating history documents in the record do not reflect any further discussion of the per-program issue. In light of the relevant provisions found in the 1950 Decree and the comments of the parties to Judge Leibell concerning this matter in March 1950, it appears that neither side resisted the application of the per-program rule to television or the strengthening of the Decree's protections in this area.

As noted, the amended Decree contains in Article VII(B) the previously quoted requirement that, "in licensing rights for public performance for radio broadcasting and telecasting," ASCAP must issue a per-program license, on demand, to "any unlicensed radio or television broadcaster." As was the case in the 1941 Decree, this form of license may be priced, for commercial programs, on the basis of either a specified sum of money for each licensed program or a percentage of sponsor payments for the program, and for sustaining

programs, on the basis of either a specified sum for each licensed program or a percentage of the "card rate" that would have applied if the program had been commercial. (*Id.*)

The new Decree also reinforced the protection of the 1941 Decree against ASCAP seeking to compel licensees to take a blanket license. With minor changes, Article VII(A) reiterated the terms of the 1941 Decree in prohibiting ASCAP from issuing a license that, for commercial programming, was based on a percentage of income from programs with no music in the AS-CAP repertory, and that, for sustaining programs, did not vary based on the actual performance of ASCAP music or the number of programs on which such music is performed. The negotiators, however, added a further protection in the form of a prohibition against ASCAP "requiring or influencing the prospective licensee to negotiate for a blanket license prior to negotiating for a per-program license." (Article VII(C).) Finally, the 1950 Decree contained a revised provision barring ASCAP from denying a per-program license to eligible licensees by overpricing it in comparison to the blanket license. The new wording required ASCAP "to use its best efforts to avoid any discrimination among the respective fees fixed for the various types of licenses which would deprive the licensees or prospective licensees of a genuine choice from among such various types of licenses." (Article VIII.)

The intended broad scope of the per-program provision was suggested in the parties' representations to Judge Leibell when they presented it to him. Thus, in its explanatory memorandum to the court, the Justice Department noted that the per-program provision "extends to television users of ASCAP music the same right to get per program licenses, on the basis of a genuine economic free choice as compared with blanket licenses, as radio users had under the 1941 Decree." (Memorandum at 8, attached to Sokler Aff. at Exh. C.) As this language and the previously described history of the Decree negotiations suggest, the drafters were assuming that this provision would apply to "television" as a gener-

ic medium, and not only in the particular form in which television happened to be found in 1950. Indeed, this is underscored by the introductory observation in the Government's memorandum "[t]hat developments like television are still in their technological and commercial infancy." (*Id.* at 2.)

The Government's memorandum also confirmed that the new Article VII(C) was added to sharpen the prohibition against ASCAP insisting on the use of the blanket license. As the Department noted: "Because of complaints received by the Department that ASCAP was by various means attempting to require all radio stations to take blanket rather than per program licenses, ASCAP may not require or influence a prospective licensee to negotiate for a blanket license prior to negotiating for a per program license." (*Id.* at 8–9.)

Similarly broad language is found in AS-CAP's memorandum to the court. Thus, it notes in general but pertinent terms that "[t]he proposed judgment imposes numerous limitations upon ASCAP's licensing of performing rights in order to assure to users of music complete freedom of choice in obtaining a license to perform some, all or any one of the musical compositions in the ASCAP repertory at a fair and non-discriminatory rate." (ASCAP Memorandum at 7, attached to Sokler Aff. as Exh. E). ASCAP described the per-program provision as requiring it to "offer to radio broadcasters and telecasters a license in which the fee is based upon programs using ASCAP music (VII))...." (*Id.* at 8.) Again, this language suggests that both sides assumed that the key provisions of the Decree were to be as broadly applicable as the scope of the problems to which they were addressed, and that the protections of the per-program provisions would extend to television as a generic medium, without any narrowing based on a technical definition of the particular technology that it then used to transmit its signals.

Apart from the parties' written explanations, when the Department's counsel Mr. Timberg orally reviewed the proposed Decree before Judge Goddard, he emphasized

the theme of ensuring a choice of licenses to music users, an aim sought not only by the per-program license but also by the newly adopted prohibition against ASCAP "restricting in any manner the rights of its members to issue non-exclusive licenses." (*See* Tr. at 7–8, annexed to ASCAP Memorandum) (referring to Articles IV and VI.) The relationship of this requirement to the per-program license is evident, since the non-exclusivity requirement makes it at least theoretically possible for the music user to seek direct or source licensing for some or all of the music that it performs, and the per-program license creates the incentive to undertake such direct or source licensing. *See ASCAP v. Showtime/The Movie Channel, Inc.*, 912 F.2d at 570. As for the per-program license provision itself, Mr. Timberg noted that it contained language "designed to strengthen the position of those users of ASCAP [music] who desire so-called 'per program' licenses from ASCAP rather than the more comprehensive 'Blanket' licenses ..." (Tr. at 8.) Mr. Timberg then stated that the Decree "does take account of new problems raised by the advent of television," presumably a reference, *inter alia*, to the inclusion of television in the Decree provision governing per-program licensing. (*Id.*)

In sum, the language of Article VII, the evident and stated purpose of the per-program provision and the references to it by the negotiators both to each other and to the court all suggest that this provision should be read to encompass television, irrespective of whether the programming is transmitted over the air or by cable. To do otherwise would import into the Decree a distinction that seems to have been altogether foreign to the concerns of the negotiators as well as profoundly subversive of the purpose sought to be achieved by the inclusion of an expanded per-program license provision in the 1950 Decree. There simply is no rationale for insisting that television be given the benefit of per-program licensing if its programming is transmitted over the air, but denied that protec-

tion if it is communicated by cable. Moreover, ASCAP cannot be heard to complain that the broader and more reasonable interpretation of Article VII(B) would unfairly deprive it of a benefit for which it negotiated in 1950. There is not a shred of evidence to suggest that ASCAP sought or obtained such a technologically-based limitation on its obligation to offer per-program licenses to telecasters.

This conclusion is further supported by the reasonable inference that the drafters of the 1950 Decree intended the coverage of Article VII(B) to be fully as broad as Article V(A) insofar as it covered both radio and television. As noted, Article V(A) uses "telecasting networks," a term that we have already concluded covers cable program suppliers. Since Article VII(B) covers "television broadcasters," which are also referred to as "telecasters," the Decree obviously uses a variety of terms to cover the same phenomenon—in the words of Mr. Timberg, "the advent of television." (March 13, 1950 Tr. at 2.) Moreover, the rationale for both provisions is so closely related as to suggest that their scope is comparable, and that if one is not artificially limited to technological or financial conditions existing in the industry in 1950, neither is the other. This inference—in which the Department of Justice concurs— further justifies the conclusion that Article VII(B) extends to cable telecasters, and thus to the applicants.

In opposing this conclusion, ASCAP relies principally on the fact that the Communications Act of 1934 defines the term "broadcasting" in a manner that excludes communications by wire from its coverage. (*See* 47 U.S.C. §§ 153(*o* ), (a), (b).) Since cable television is transmitted by wire, ASCAP would have us conclude that cable television suppliers cannot be "television broadcasters."[27]

The obvious problem with this argument is that there is no evidence that the negotiators of the Decree had in mind this technical definition of broadcasting when they

---

27. ASCAP has incorporated by reference the arguments that it originally made in its post-trial reply brief in the *Showtime* proceeding. I cite

that brief as "ASCAP's SMC Reply Brief at __", with the appropriate page numbers inserted.

made the per-program provisions applicable to "television broadcasters." Indeed, ASCAP's assumption on this point is plainly contradicted by the previously noted interchangeable usage in the Decree of "television broadcaster" and "telecaster"; this is simply inconsistent with the notion that the drafters were using the term "broadcaster" as a term of art.

In fact, if the drafters were focussing on anything with respect to the technology of television, it was apparently that television was still in its infancy and evolving both technologically and economically. Given the evolving nature of the television medium and the evident intention of the parties to apply the per-program rules to that medium, it is a very long stretch to infer that either side had in mind a time-bound and technology-based definition of television in drafting Article VII(B). Moreover, as noted, such a distinction would have been entirely arbitrary, since the beneficial effect of Article VII does not vary at all depending upon whether television programming is transmitted by radio waves or cable.[28]

ASCAP makes the related argument that because cable television can be received only through unscrambling equipment for which the viewing audience must pay a subscription fee, the cable program suppliers cannot be considered broadcasters. (*See* ASCAP's SMC Reply Brief at 21) (citing, *inter alia, KMLA Broadcasting Corp. v. Twentieth Century Cigarette Vendors Corp.*, 264 F.Supp. 35, 42 (C.D.Cal.1967) (court focusses on statutory requirement that broadcasting covers communications "intended to be received by the public")). ASCAP further argues that the FCC has, by regulation, distinguished between "broadcasting" and "cablecasting." (*See id.*) (citing 47 C.F.R. § 74.1101(j).)

These assertions again miss the mark because they are premised on the notion that the drafters of the 1950 Decree intended Article VII to correspond to the technical definition of "broadcasting" in the 1934 Communication Act, and at least by implication that they expected its scope to be limited by subsequent definitional categories for technology not yet in existence. For the reasons noted, this appears unsupported by the history of the negotiations, the rationale for the relevant provisions of the Decree, and the language used. It also bears noting that ASCAP's argument, insofar as it is based on the fact that cable viewers pay for the service, is plainly wide of the mark in interpreting the 1950 Decree, because during the relevant time period the FCC and the courts interpreted the statutory term "broadcasting" to cover subscription radio services, even though those services obviously required payment for reception. It was only beginning in the late 1960's that some courts and the FCC finally started to treat subscription broadcasting, for purposes of the jurisdictional limits of the 1934 Act, as not broadcasting. *See generally National Ass'n for Better Broadcasting v. FCC*, 849 F.2d 665, 666–68 (D.C.Cir.1988).[29] This ebb and flow in the construction of the "broadcasting" provision of the 1934 Communications Act only underscores the unreasonableness of tying the 1950 Decree, which was addressing an entirely different set of concerns, to the resolution of issues concerning the extent of the FCC's regulatory authority over esoteric forms of communications technology. *Cf. McCarthy v. Bronson*, 111 S.Ct. at 1742 (rejecting proposed reliance on statutory definitions of "conditions of confinement" found in statutes that had different purposes from the Magistrates Act).

In further support of its position, ASCAP invokes, albeit only in passing, the previously cited differences between the financial and technological circumstances of cable telecasters and those of over-the-air broadcasters. (*See* ASCAP's SMC Reply

---

**28.** ASCAP's reliance on the 1934 Communications Act is somewhat ironic since the Supreme Court has held that, although the Act did not explicitly address the advent of cable television in the form of CATV, it nonetheless should be broadly read to authorize FCC jurisdiction over this new technological phenomenon. *See United States v. Southwestern Cable Co.*, 392 U.S. 157, 171–73, 88 S.Ct. 1994, 2002–03, 20 L.Ed.2d 1001 (1968) (construing 47 U.S.C. § 152(a).)

**29.** Indeed, the FCC did not formally adopt a technology-based definition for purposes of subscription services until 1986–87. *See id.* at 668.

Brief at 21–22) (quoting *Capital Cities Cable, Inc. v. Crisp,* 467 U.S. at 700–01, 104 S.Ct. at 2701.) We have addressed these distinctions at length in connection with the "licensing at the source" question, and they are no more probative of ASCAP's reading of Article VII(B) than of its interpretation of Article V(A).

 ASCAP's final argument gives us brief pause. It points to that portion of Article VII that specifies the principles for pricing the per-program license. As discussed, the fee for commercial programs may be "expressed in terms of dollars, requiring the payment of a specified amount for each program in which compositions in the ASCAP repertory shall be performed," or else "based upon the payment of a percentage of the sum paid by the sponsor of each program for the use of the broadcasting or telecasting facilities of such radio or television broadcaster." (Article VII(B)). Since the Decree leaves to ASCAP the choice of which formula to use in pricing the per-program license, ASCAP asserts that Article VII(B) cannot apply to cable television since a portion of the program suppliers—those that provide the so-called premium services—have "no 'commercial' programs, no 'sponsors' and, hence, there are no sums paid by the sponsors of commercial programs. In consequence ... ASCAP does not have the option which the 'explicit language' and 'plain meaning' of Section VII(B) give it." (ASCAP's SMC Reply Brief at 23.)

Upon reflection, there is less to this argument than meets the eye. First, it is inapplicable to the basic cable program suppliers, since their programming contains advertising and hence generates sponsor revenue. Second, even with respect to premium cable programming, ASCAP's argument does not justify such a narrow reading of the Decree.

The way in which the Decree frames the pricing alternatives was of course a result of the drafters' understanding of how commercial television was operating in 1949–50. As was the case in the 1941 Decree, which contained similar language with respect to radio, the negotiators chose to give ASCAP the freedom to select from available alternatives in framing the fee portion of the per-program license. This decision is equally reflected in the equivalent provision in the 1950 Decree governing the per-program license fees for sustaining programs. It follows, then, that under the Decree ASCAP is entitled to make the choice of fee formula, and cannot be deprived of that right.

It does not follow, however, that if a telecaster has no sponsor and thus no sponsor revenues, it may not receive a per-program license. Article VII(B) gives AS-CAP the choice between alternative methods of payment, but if the manner of operation of a given telecaster makes one option valueless to ASCAP, that simply means that, as a rational business organization, it will choose the other.

To read Article VII(B) otherwise would, as the cliche goes, allow the tail to wag the dog. That provision and the related terms of Articles IV, V and VI were designed, in the words of ASCAP's attorneys, "to assure to users of music complete freedom of choice in obtaining a license ... at a fair and non-discriminatory rate." (Memorandum to Judge Leibell at 7, attached to Sokler Aff. at Exh. E.) Although the provision gave ASCAP some discretion in choosing between two alternative fee formulas when designing the per-program license, it surely did not purport to guarantee to ASCAP that both alternatives would be economically meaningful in all circumstances, on pain of denying the licensee the opportunity to obtain such a license.[30] The fact that the shape or operational pattern of a portion of the television industry has changed since 1950 may influence how AS-CAP exercises its choice as to a fee formula, but it does not justify denying to the otherwise eligible telecasters the type of license that the Decree drafters and the

---

30. If, for example, some over-the-air stations chose for whatever reason to reduce their advertising revenues by, say, seventy-five percent, this might make the second alternative formula for per-program license fees very unremunerative. That would not, however, provide a basis for denying those stations the opportunity to obtain a per-program license.

court plainly recognized as a significant instrument "to foster the goal of competition which underlies this, and presumably all, antitrust injunctions." *United States v. ASCAP*, 586 F.Supp. 727, 730 (S.D.N.Y. 1984). *See also ASCAP v. Showtime/The Movie Channel, Inc.*, 912 F.2d at 570; *Buffalo Broadcasting Co. v. ASCAP*, 744 F.2d at 926–28 & n. 7.

It bears emphasis in this regard that even if ASCAP, as a practical matter, has only one option in picking between the two fee formulas for per-program licenses to some cable telecasters, this does not speak at all to the amount of fees that it will receive. Obviously, the amount of any per-program fee can be set at a level that would be equivalent to what ASCAP would likely receive if the station had sponsors instead of subscribers.

Finally, I note that in the event that ASCAP views the advent of premium cable television as a change of circumstance so significant as to seriously prejudice its position under the Decree because the premium services have no sponsor revenue, the Society always has the option of seeking a modification of the Decree to give it another alternative fee formula for the per-program license. *See, e.g., United States v. ASCAP*, 586 F.Supp. at 729–32 (addressing ASCAP's motion to modify 1950 Decree). In noting this option, I of course express no views as to the likely outcome of such a proceeding.

Having considered ASCAP's arguments in favor of its narrow interpretation of Article VII(B), I turn to the analysis offered by the Department of Justice. The Department concludes, for two reasons, that Article VII(B) should not be read to give cable telecasters a right to a per-program license. First, the Department notes that Articles V(A) and VII(B) should be treated as co-extensive, and since it concluded that Article V(A) should not apply to the applicants, it necessarily follows that Article VII(B) also should not. Second, the Department argues that "[i]n one respect,

the per-program license requirement may be less compatible with the structure of the cable industry than is the concept of a network license." (Memorandum for the United States at 4.) In explanation, the Department appears to be saying that if Article VII(B) were interpreted to cover cable television, ASCAP would be obliged to offer a per-program license to the system operators, which seem to have little or no need for it since they have no control over the cable programming that they transmit to their viewers. In contrast, local over-the-air stations may benefit from such a license since, in addition to network programming, they select their own locally produced and syndicated programming, and thus could use the per-program license either as a bridge to direct or source licensing, or as an incentive to select programs with no ASCAP music.

Having once again given the Department's views careful consideration, I am unpersuaded by them. As for the first point, the Department is undoubtedly correct that Articles V(A) and VII(B) were intended to be co-extensive given the similarity of the terminology used in those two provisions. Since, however, I have concluded that Article V(A) covers cable program suppliers, I necessarily also conclude that Article VII, insofar as it ensures the availability of per-program licenses to telecasters or television broadcasters, also covers cable television.

As for the Department's other argument, it appears to be beside the point, for two reasons. First, it is not at all clear why the scope of Article VII(B) should be governed by whether some or all of the potentially eligible licensees are likely to opt for the per-program license. As noted, the 1941 Decree made this license available to all radio broadcasters even though most broadcasters apparently require a blanket license.[31] All that the Decree purports to do is to offer the licensee a choice, and he may select the licensing option that he

---

31. Indeed, in the related *Buffalo Broadcasting* proceeding ASCAP is arguing that the per-program provision was never intended to be usable by most television stations.

deems best suited to his business needs.[32]

Second, we are not concerned here with whether cable system operators should receive the option of a per-program license or would benefit from it. The current applicants are cable program suppliers, and they plainly could benefit from the availability of such a license, as the Department recognizes. Moreover, if, as suggested, the cable program suppliers are entitled to licensing at the source under Article V(A), there may never be an occasion when the cable system operators in fact need any license, whether blanket or per-program. If the cable system operators continue to serve only as transmitters of programming prepared by others, they would not need to be separately licensed, and hence the question that the Department poses would never need to be answered.

In sum, I find neither ASCAP's nor the Department's reading of Article VII(B) to be persuasive. Since there are no genuine disputes as to any of the facts that are material to the resolution of this controversy, and since I read Article VII(B) as giving the applicants the right to a per-program license on reasonable terms if they so desire it, I conclude that judgment should be entered in their favor on this claim as well.[33]

## CONCLUSION

For the reasons stated, the applicants' petition for an order directing ASCAP to offer them reasonable terms for a blanket license that would cover the performance of its music when the applicants' programming is transmitted by their affiliated cable system operators is granted, as is applicants' request for an order directing ASCAP to offer them reasonable terms for a per-program license that would cover the same performance of its music. Applicants shall submit an order within seven (7) days.

SO ORDERED.

## MEMORANDUM OF COURT'S RATIONALE

In light of this court's decision issued on July 11, 1991, the parties have submitted alternative versions of an Order and Judgment for this court's approval. I am signing a version that is an amalgam of both sides' submissions, and I briefly note here my reasons for doing so.

The language found in the competing versions does not differ substantially or, I believe, meaningfully, except in two respects. First, applicants propose a specific provision requiring ASCAP to quote a rate within thirty days for those applicants that have already requested a "through to the viewer" or per-program license. Second, ASCAP seeks certification under 28 U.S.C. § 1292(b) to ensure prompt appellate review.

In view of the requirement of Article IX(A) of the Consent Decree that ASCAP promptly quote a fee for a license upon request of a licensee, it is appropriate at this stage to include an explicit directive to ASCAP to offer license terms for the respective licenses insofar as any applicants may have already requested them. ASCAP is, of course, free to seek a stay pending appeal if it wishes to be relieved of this obligation.[1]

As for certification, it appears altogether likely that the order entered by this court is appealable as an order granting an injunction. *See* 28 U.S.C. § 1292(a)(1). Nonetheless, in perhaps an excess of caution, I deem it advisable to provide a form of certification to enhance the likelihood that appellate review will be available now. In doing so, however, I conclude that certification is more appropriately made under Fed.R.Civ.P. 54(b).

Section 1292(b) contemplates that a court, having decided one or several issues that are closely related to the ulti-

32. I note in any event that, to the extent that system operators provide local origination programming, they presumably would benefit from a per-program license. *See* Affidavit of Brenda Fox, sworn to July 24, 1989, at ¶¶ 5, 7, 9, 11–13.

33. In view of this disposition, there is no need to address applicants' alternative arguments based on the non-discrimination provision of Article VIII of the 1950 Decree.

1. I make no prejudgment as to the merits of such an application.

mate disposition of the claims and defenses advanced by the parties, may deem it advisable to certify its decisions for interlocutory review to obtain a definite ruling that may materially advance the disposition of the parties' claims. *See generally McDonnell Douglas Finance Corp. v. Pennsylvania Power & Light Co.*, 849 F.2d 761, 764 (2d Cir.1988); *Isra Fruit Ltd. v. Agrexco Agric. Export Co.*, 804 F.2d 24, 25–26 (2d Cir.1986). In contrast, Rule 54(b) provides for certification when the court has adjudicated with finality one or more, but not all, of the claims asserted by the parties. *See, e.g., Cullen v. Margiotta*, 811 F.2d 698, 710–11 (2d Cir.), *cert. denied*, 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987).[2]

In this somewhat unusual proceeding, the initial pleading was a petition requesting only that the court set reasonable fees under Article IX(A) of the 1950 Consent Decree. Nonetheless, in the course of litigating ASCAP's motion for partial summary judgment, applicants pressed, and prevailed on, a separate though related claim for relief—their assertion that they are entitled to through-to-the-viewer and per-program licenses, and that the court should order ASCAP to offer those forms of license to applicants. The question of applicants' entitlement to those types of licenses is not merely an issue raised by the original petition—although its resolution would be necessary to a fee-setting decision—but rather comprises a separate claim raised by applicants, since the relief that they seek contemplates that ASCAP will be required to quote a fee and engage in negotiations concerning the terms of such licenses. Only in the event that the negotiations fail would the court be called upon to address the claim articulated in the original petition—that ASCAP and the applicants should be assigned a reasonable fee by the court.

This two-step, or two-claim, process is in fact necessitated by the underlying Consent Decree, which contemplates that the parties engage in negotiation concerning the fees for a license requested by an applicant before asking the court to set the fee. *See* Consent Decree, Art. IX(A). *See also United States v. ASCAP*, 586 F.Supp. 727, 731 (S.D.N.Y.1984) ("[r]ecourse to the judicial rate-setting mechanism ... is a process of last resort for those situations where the market participants are unable to reach an accord among themselves"). Thus, once the court determines the form of license to which applicants are entitled, Article IX(A) directs the parties to seek voluntary resolution of the fee question before requiring the rate court to decide the issue.

Given these circumstances, Fed. R.Civ.P. 54(b) is applicable, since the court has finally determined one claim asserted by applicants—even though it was not articulated in their original pleading[3]—and there remains a separate claim that may still have to be addressed.[4] *See, e.g., Cullen v. Margiotta*, 811 F.2d at 711 (claims are separable for purposes of Rule 54(b) "if they involve at least some different questions of fact and law and could be separately enforced ... or if 'different sorts of relief' are sought....") (citations omitted). *Cf. Hudson River Sloop Clearwater, Inc. v. Department of Navy*, 891 F.2d 414, 418 (2d Cir.1989) (distinguishing cases in which purportedly certifiable claim is dependent on one or more remaining claims). As for the propriety of such a certification in this case, there is little doubt that appellate review at this stage would be far preferable to waiting until the remaining claim is adjudicated. First, depending upon the final disposition of the license structure issues, it may well be the case that the second claim will never need to be adjudicated, since the parties, once they know definitively the shape of the licenses that ASCAP must issue, may negotiate the fees. This is unlikely to happen, however, if AS-

---

**2.** Rule 54(b) certification is also available if the court has disposed of all of the claims of some, but not all, of the parties. *See id.* at 710.

**3.** *See* Fed.R.Civ.P. 15(b).

**4.** Since the claim ultimately resolved in the July 11 Memorandum and Order does not involve the setting of a fee, it may fairly be viewed as an exercise of the court's continuing jurisdiction under Article XVII of the Decree rather than a decision pursuant to Article IX(A) of the Decree.

CAP cannot now obtain an appellate determination of the license structure issues. Second, even if the court were now to undertake to set fees for the licenses to the applicants, that process would depend upon the required shape of the licenses, and hence the efforts of the parties and the court would be wasted if the Circuit Court were ultimately to conclude that the licenses issued to applicants should differ from what I determined in the July 11, 1991 Memorandum and Order. *Cf. Fletcher v. Marino,* 882 F.2d 605, 610 (2d Cir.1989) (noting that immediate appeal "will expedite resolution of the issues in this case"); *Pension Benefit Guaranty Corp. v. LTV Corp.,* 875 F.2d 1008, 1014–15 (2d Cir.1989) (citing interest in "sound judicial administration").

In sum, I conclude that there is no just reason to delay entry of a judgment directing ASCAP to offer through-to-the-viewer and per-program licenses to the applicants if they wish them. Accordingly, judgment will be entered in accordance with the terms prepared by the court.

SO ORDERED.

### ORDER AND JUDGMENT

This action came on to be heard on motion for summary judgment pursuant to Rule 56, Fed.R.Civ.P. The Court, having considered the applications, the affidavits submitted by all parties together with the exhibits thereto, and the memoranda of all parties and of the United States; having heard oral argument thereon; having found that there is no genuine issue as to any material fact and that Applicants are entitled to judgment as a matter of law; having previously filed its Memorandum and Order on July 11, 1991; and having determined, by Memorandum and Order dated August 8, 1991, pursuant to Fed. R.Civ.P. 54(b), that there is no just reason for delay in entering judgment, it is

ORDERED, ADJUDGED AND DECREED:

1. That the American Society of Composers, Authors and Publishers ("ASCAP") is directed to offer, upon the request of any Applicant, a license for public performance of the copyrighted music of ASCAP's members, the scope of which includes all transmissions made by the Applicant in the provision of its programming and by any distributor in delivering that programming (a "through-to-the-viewer" license);

2. That ASCAP is directed to offer, upon the request of any Applicant, as an alternative to a blanket license covering all programming of such Applicant, a per-program form of license;

3. That ASCAP, its officers, agents, employees, attorneys or any of them, and all persons acting in concert or participation with them, be and hereby are permanently enjoined from failing or refusing to offer a license for public performance of the copyrighted music of ASCAP's members to any Applicant, upon request, as set forth in paragraphs 1 and 2 of this Order and Judgment; and

4. That ASCAP is further directed within thirty (30) days of the entry of this Order and Judgment to offer, to each Applicant who has previously made application for such a form of license for public performance of the copyrighted music of ASCAP's members, a license consistent with the terms set forth in paragraphs 1 and 2 of this Order and Judgment.

SO ORDERED.